In the
# United States Court of Appeals
## for the Fifth Circuit

---

## No. 24-30307

---

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

*versus*

BRENNAN JAMES COMEAUX,

*Defendant - Appellant*

---

Appeal from the United States District Court
For the Western District of Louisiana
USDC No. 6:23-CR-183-1

---

## ORIGINAL BRIEF FOR THE APPELLANT
## BRENNAN JAMES COMEAUX

---

**REBECCA L. HUDSMITH**
Federal Public Defender

**DUSTIN C. TALBOT**
Appellate Chief
Federal Public Defender's Office
Middle and Western Districts of
Louisiana
102 Versailles Boulevard, Suite 816
Lafayette, Louisiana 70501
Telephone: (337) 262-6336

*Attorney for the Appellant*

In the
# United States Court of Appeals
### for the Fifth Circuit

---

## No. 24-30307

---

### UNITED STATES OF AMERICA,
*Plaintiff - Appellee,*

*versus*

### BRENNAN JAMES COMEAUX,
*Defendant - Appellant*

---

Appeal from the United States District Court
For the Western District of Louisiana
USDC No. 6:23-CR-183-1

---

## ORIGINAL BRIEF FOR THE APPELLANT
## BRENNAN JAMES COMEAUX

---

## CERTIFICATE OF INTERESTED PERSONS

---

Pursuant to Fifth Circuit Rule 28.2.1, undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

i

**Judges Below:**

> The Honorable David C. Joseph, United States District Judge
> The Honorable Carol B. Whitehurst, United States Magistrate
>     Judge

**Defendant - Appellant:**

> Brennan James Comeaux
> B.O.P. Reg. No. 74711-510

**Attorneys for the Defendant - Appellant:**

> Dustin C. Talbot (on appeal)
>     Appellate Chief
> Aaron Albert Adams (in the district court)
>     Assistant Federal Public Defender
>     Federal Public Defender's Office
>     Middle and Western Districts of Louisiana
>     102 Versailles Boulevard, Suite 816
>     Lafayette, Louisiana 70501

**Attorneys for the Government - Appellee**

> Camille Ann Domingue (on appeal)
> Casey Richmond (in the district court)
>     Assistant United States Attorneys

Lafayette, Louisiana, September 3, 2024.

> _s/Dustin C. Talbot_
> DUSTIN C. TALBOT

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

The defendant-appellant, Brennan James Comeaux, seeks oral argument on an issue of first impression in this Court: Whether 26 U.S.C. § 5861(d) violates the Second Amendment by prohibiting the in-home possession of homemade silencers that are not registered with the Treasury?

This issue is sufficiently complex and unique that the decisional process would be significantly aided by oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...........................................i

STATEMENT REGARDING ORAL ARGUMENT .................................iii

TABLE OF CONTENTS ...................................................................iv

TABLE OF AUTHORITIES ..................................................................vii

STATEMENT OF JURISDICTION...........................................................1

STATEMENT OF THE ISSUES.................................................................2

1. Is 26 U.S.C. § 5861(d), which prohibits the personal possession of silencers that are not registered with the Treasury, facially unconstitutional under the Second Amendment?

2. Is 26 U.S.C. § 5861(d), which prohibits the personal possession of silencers that are not registered with the Treasury, unconstitutional as applied to a gun collector who made five homemade silencers to protect his hearing and make his self-defense actions more effective and who only possessed those silencers in his rural personal residence?

STATEMENT OF THE CASE ....................................................................2

SUMMARY OF THE ARGUMENT .........................................................6

ARGUMENT ........................................................................................10

I. 26 U.S.C. § 5861(d) facially violates the Second Amendment because possessing unregistered silencers is protected by the plain text of the Amendment, and the government cannot show a historical tradition of prohibiting possession of unregistered silencers................................................................... 10

A.   Standard of review ............................................. 11

B.   The National Firearms Act ................................. 12

C.   Comeaux was convicted under a statute, 26 U.S.C. § 5861(d), that is unconstitutional as applied to silencers . 15

    1.   The Second Amendment covers the conduct prohibited by § 5861(d): possession of unregistered silencers ................................................................ 17

        a.   Silencers are "arms" under the plain text of the Second Amendment ................................... 17

        b.   Alternatively, silencers are implicitly protected under the Second Amendment ....... 25

    2.   The government cannot show that § 5861(d)'s silencer prohibition addresses a "general societal problem" as required by *Bruen* because silencers are neither dangerous nor unusual ................................................ 27

    3.   There is no evidence of "relevantly similar" founding-era regulations prohibiting the possession of unregistered silencers ................................................ 32

        a.   There is no evidence of "relevantly similar" founding-era regulations requiring registration and taxation of firearms or silencers ........................................................... 35

        b.   There is no evidence of "relevantly similar" founding-era regulations creating a lifetime disarmament of someone who failed to fill out paperwork and pay a tax .......................... 38

        c.   Historical laws regulating commerce surrounding firearms are not "relevantly

similar" to § 5861(d)'s prohibition on personal possession of a silencer ................... 40

II. 26 U.S.C. § 5861(d)'s prohibition on possession of unregistered silencers violates the Second Amendment as applied to Comeaux, an avid gun collector who possessed homemade silencers at his rural residence for self-defense ...................... 41

    A. Standard of review ............................................... 41

    B. Argument .......................................................... 42

CONCLUSION .......................................................... 44

CERTIFICATE OF SERVICE .................................... 45

CERTIFICATE OF COMPLIANCE ............................ 45

# TABLE OF AUTHORITIES

<u>CASES</u>                                                                     <u>PAGE</u>

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of New Jersey*, 910 F.3d 106 (3rd Cir. 2018) .................................................................. 20

*Class v. United States*, 583 U.S. 174 (2018) ..................................... 11, 42

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................ *passim*

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ....................... 25-27

*Haynes v. United States*, 390 U.S. 85 (1968).................................... 12-13

*Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014) ...................................................................................... 26-27

*Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016), *vacated on reh'g en banc on other grounds*, 849 F.3d 114 (4th Cir. 2017) .................. 19-20, 24

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (June 23, 2022) ............................................................ *passim*

*NLRB v. Noel Canning*, 573 U.S. 513 (2014)........................................... 34

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)............................. 15, 17

*Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023)........... 12, 19, 23-24, 38-39

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980)................ 25

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) ........................................ 25

*Teixeira v. Cnty. of Alameda*, 873 F.3d 670 (9th Cir. 2017) ................... 26

*United States v. Anderson*, 885 F.2d 1248 (5th Cir. 1989) (en banc) .... 12

*United States v. Clark*, 582 F.3d 607 (5th Cir. 2009) ............................. 11

*United States v. Connelly*, No. 23-50312, --- F.4th ----, 2024 WL 3963874 (5th Cir. Aug. 28, 2024).................................................... 42

*United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018)............................ 17

*United States v. Miller*, 307 U.S. 174 (1939) ........................................ 18

*United States v. Rahimi*, 144 S. Ct. 1889 (2024)........................... *passim*

*United States v. Salerno*, 481 U.S. 739 (1987) ....................................... 11

*Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019) .......................... 20

## STATUTES, REGULATIONS, & CONGRESSIONAL RECORDS

U.S. Const. amend. II ("Second Amendment") ............................... *passim*

18 U.S.C. § 921(a)(3)(C) ................................................................... 13

18 U.S.C. § 921(a)(25) ...................................................................... 13

18 U.S.C. § 922(g)(1) ........................................................................ 38

18 U.S.C. § 922(g)(8)(C)(i) .............................................................. 38

18 U.S.C. § 3231................................................................................ 1

18 U.S.C. § 3742 ............................................................................... 2

26 U.S.C. § 5811(a) .......................................................................... 14

26 U.S.C. § 5812(a) .......................................................................... 14

26 U.S.C. § 5822 .............................................................................. 14

26 U.S.C. § 5841(a) .......................................................................... 13

26 U.S.C. § 5845(a) ..................................................................... 13, 24

26 U.S.C. § 5861(d) ............................................................... *passim*

26 U.S.C. § 5861(i) .................................................................... 4

26 U.S.C. § 5871 ...................................................................... 14

28 U.S.C. § 1291 ........................................................................ 2

27 C.F.R. § 479.63 .................................................................... 14

27 C.F.R. § 479.85 .................................................................... 14

29 C.F.R. § 1910.95 .................................................................. 22

*National Firearms Act: Hearings on H.R. 9066 Before the H. Comm.
on Ways & Means*, 73rd Cong. 1, 111 (1934) .................................. 12

*To Regulate Commerce in Firearms: Hearings on S. 855, S. 2258, and
S. 3680 Before a S. Comm. on Commerce*, 73rd Cong. (1934) ....... 12

## HISTORICAL REGULATIONS

1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation
to the Sale and Carrying of Dangerous Weapons. ch. 195, § 2 ..... 36

1913 Mich. Pub. Acts 472, An Act Providing for the Registration of the
Purchasers of Guns, Pistols, Other Firearms and Silencers for
Firearms and Providing a Penalty for Violation, § 1 ..................... 36

1917 Cal. Sess. Laws 221-225, An act relating to and regulating the
carrying, possession, sale or other disposition of firearms capable
of being concealed upon the person § 7 .......................................... 36

1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture,
sale, possession, carrying, or use of any blackjack, slingshot,
Billy club, sandclub, sandbag, metal knuckles, dirk, dagger or
stiletto, and regulating the carrying and sale of certain firearms,

and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, § 5 36

1931 Ill. Laws 453, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 4 ............................................. 36

1933 Wyo. Sess. Laws 117, An Act Relating to the Registering and Recording of Certain Facts Concerning the Possession and Sale of Firearms by all Wholesalers, Retailers, Pawn Brokers, Dealers and Purchasers, Providing for the Inspection of Such Register, Making the Violation of the Provisions Hereof a Misdemeanor, and Providing a Penalty Therefor, ch. 101, §§ 1-4 36

1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8 .......................................................................................... 36

1931-1933 Wis. Sess. Laws 245-47, An Act . . . Relating to Machine Guns and to Make Uniform the Law with Reference Thereto, ch. 76, § 1, pt. 164.01 to 164.06 ............................................. 36

1933 Haw. Sess. Laws 36-37, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 3 ........................ 36

1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 1-7 .......................................................................... 36

## OTHER SOURCES

ATF, *Part III: Crime Guns Recovered and Traced Within the United States and Its Territories* .................................................. 28

Brian J. Fligor, *Prevention of Hearing Loss from Noise Exposure*, Better Hearing Institute (2011) ...................................... 21

Brueck SE, et al., National Institute for Occupational Safety and Health ("NIOSH"), *Health Hazard Evaluation Report: Measurement of Exposure to Impulsive Noise at Indoor and Outdoor Firing Ranges During Tactical Training Exercises* 14, HHE Report 2013-01243208 ........................................................... 22

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495 (2019) ..................... 19

Hiram Percy Maxim, *Forward* to Hiram Percy Maxim, *Experiences with the Maxim Silencer* (1915) ..................................................... 21

Jay M. Bhatt et al., *Epidemiology of Firearm and Other Noise Exposures in the United States*, Laryngoscope, 127 (March 2017) ...................................................................................................... 22

Justin Stevens, *Reloading the Second Amendment: The Undue Burdens of the National Firearms Act and Their Remedies*, 49 Tex. Tech L. Rev. Online Edition 149 (2017) ............................ 23, 28

Michael Stewart, *Recreational Firearm Noise Exposure*, American Speech-Language-Hearing Association .......................................... 22

Michael Stewart et al., *National Hearing Conservation Association Position Statement: Recreational Firearm Noise* (March 2017) ... 22

Nathan Rott, *Debate Over Silencers: Hearing Protection or Public Safety Threat?*, All Things Considered (NPR Mar. 21, 2017) ....... 28

Oliver Krawczyk, *Dangerous and Unusual: How an Expanding National Firearms Act Will Spell Its Own Demise*, 127 Dick. L. Rev. 273 (2022) ........................................................................ 30, 37

P. Clark, *Criminal Use of Firearm Silencers*, 8 W. Crim. Review 44 (2007) ...................................................................................... 29-30

Ronald Turk, *White Paper: Options To Reduce Or Modify Firearms Regulations* (January 2017) ............................................................ 29

Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 Cumb. L. Rev. 33 (2016) ................................................................12, 22-23

World Health Organization, *Guidelines for Community Noise* (1999) ........................................................................21-22

In the
United States Court of Appeals
for the Fifth Circuit

No. 24-30307

UNITED STATES OF AMERICA,
*Plaintiff - Appellee,*

*versus*

BRENNAN JAMES COMEAUX,
*Defendant - Appellant*

Appeal from the United States District Court
For the Western District of Louisiana
USDC No. 6:23-CR-183-1

## ORIGINAL BRIEF FOR THE APPELLANT
## BRENNAN JAMES COMEAUX

## STATEMENT OF JURISDICTION

This matter originated in the United States District Court for the Western District of Louisiana. The district court's jurisdiction arose under 18 U.S.C. § 3231 inasmuch as the action involved an allegation of an offense against the United States. This is an appeal of a final judgment entered by the district court on May 7, 2024. ROA.82.

1

Appellant filed a timely notice of appeal on May 14, 2024. ROA.88. As such, this Court's jurisdiction to review the matter is provided by 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## STATEMENT OF THE ISSUES

1. Is 26 U.S.C. § 5861(d), which prohibits the personal possession of silencers that are not registered with the Treasury, facially unconstitutional under the Second Amendment?

2. Is 26 U.S.C. § 5861(d), which prohibits the personal possession of silencers that are not registered with the Treasury, unconstitutional as applied to a gun collector who made five homemade silencers to protect his hearing and make his self-defense actions more effective and who only possessed those silencers in his rural personal residence?

## STATEMENT OF THE CASE

The appellant Brennon James Comeaux was a 48 year old gun collector living in rural Iberia Parish, Louisiana. ROA.148. He had lived a largely law-abiding life, having only a single prior conviction for the misdemeanor offense of operating a vehicle while intoxicated. ROA.155. Comeaux is now serving a 24 month sentence in federal prison because

amid his extensive gun collection, he possessed five homemade silencers that he fabricated for additional self-defense at his rural home. The constitutionality of prohibiting an avid gun collector like Comeaux from possessing homemade and unregistered silencers is the subject of this appeal.

Comeaux was not in any way prohibited from owning firearms under Louisiana or federal law. He owned dozens of antique and modern shotguns, rifles, and pistols, along with various firearm accessories and fabrication tools. Comeaux came to the attention of law enforcement when Comeaux and his rural neighbors repeatedly got into arguments that resulted in the police being called. Comeaux claimed that his neighbors were trespassing on his property, vandalizing his vehicles and property, and harassing him. Comeaux reported to police that his neighbors had repeatedly trespassed on his property, had killed his grass with weed killer and put cooking oil in his equipment. Comeaux's neighbors complained that Comeaux would routinely shoot guns on his private property. ROA.150-52. Comeaux reported to police that he felt his firearms were "the only self-defense he had against his neighbors." ROA.152.

On May 31, 2022, officers were dispatched to Comeaux's rural residence because the neighbor reported that Comeaux discharged a firearm in a threatening manner. When officers arrived, Comeaux admitted to officers that he discharged the firearm, but only to scare away the neighbors, who were harassing him again. As a result of this incident, officers obtained a search warrant for Comeaux's residence and seized numerous antique and modern shotguns, rifles, and pistols, along with various firearm accessories and fabrication tools. ROA.150-51.

Relevant here, included in Comeaux's gun collection were five suspected silencers. Comeaux freely admitted to an ATF agent when interviewed that he had personally manufactured the silencers and that "he needed them for protection from his neighbors." ROA.151-52.

Comeaux was indicted in federal court with one count of possession of unregistered firearms in violation of 26 U.S.C. § 5861(d) and one count of receipt or possession of firearms unidentified by serial number in violation of 26 U.S.C. § 5861(i). ROA.9-10. In both counts, the "firearms" listed are the five homemade silencers possessed by Comeaux at his home. ROA.9-10.

Comeaux filed a motion to dismiss the indictment arguing both that 26 U.S.C. § 5861(d) and (i) facially violated the Second Amendment and *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (June 23, 2022), and that the prosecution violated the Second Amendment as applied to someone who "is not a prohibited person prevented from possessing firearms under federal or state law" and who "built his own firearm suppressors, five in total, and did not register them or identify them by serial number as required by federal law." ROA.29-39. The government filed a memorandum in opposition. ROA.41-51.

The court issued a memorandum ruling denying Comeaux's constitutional challenge to 26 U.S.C. § 5861(d) and (i). ROA.52-59. The court below concluded that the 26 U.S.C. § 5861's requirement that silencers be registered was fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons. ROA.52-59.

Comeaux entered into a written plea agreement where he agreed to plead guilty one count of possession of unregistered firearms in violation of 26 U.S.C. § 5861(d). ROA.64. As a part of the plea, the parties agreed that the silencers in question were "firearms" under the law. ROA.143. The parties also agreed that the plea was conditional in that Comeaux

was reserving his right to continue his preserved challenge the constitutionality of 26 U.S.C. § 5861(d) on appeal:

> United States acknowledges that this is a conditional plea pursuant to Federal Rules of Criminal Procedure 11(a)(2), and that Brennan Comeaux reserved his right to appeal the Court's adverse ruling as to his Motion to Dismiss and, should such appeal be successful, Brennan Comeaux shall be allowed to withdraw his guilty plea.

ROA.132. On May 7, 2024, the district court sentenced Comeaux to serve 24 months in prison and three years of supervised release. ROA.82. Comeaux filed a timely notice of appeal on May 14, 2024. ROA.88.

## SUMMARY OF THE ARGUMENT

The appellant Brennan James Comeaux was a 48 year old gun collector living in rural Iberia Parish, Louisiana when federal authorities raided his home and inspected his collection of antique and modern shotguns, rifles, and pistols, along with his various firearm accessories and fabrication tools. Included in his firearms collection were five homemade silencers that Comeaux himself manufactured "for protection from his neighbors" whom had been trespassing on his property, vandalizing his property, and harassing him. Comeaux, who had no prior felony or violent convictions—and who was not a person prohibited from possessing firearms by state or federal law—is now serving a 24 month

federal prison sentence because he possessed the homemade silencers in his home for self-defense.

Comeaux was convicted of violating 26 U.S.C. § 5861(d), a vestige of the National Firearms Act, that prohibits simply possessing a silencer that is not registered to and taxed by the federal government. Section 5861(d), as applied to unregistered silencers, facially violates the Second Amendment.

*First*, silencers receive Second Amendment protection because they constitute "arms" under the plain text of the Second Amendment, they fit within the Supreme Court's definition of "arms" set forth in *Heller*, and they are a modern-day analogue to various firearm accessories historically considered to be "arms" for Second Amendment purposes. Silencers are also unanimously considered "firearms" under the statutory federal firearms regime and other Circuits have held that the Second Amendment necessarily encompasses ancillary rights and tools necessary to the realization of the core right to possess a firearm for self-defense.

*Second*, the prohibition on unregistered silencers does not address a "general societal problem" as required by *Bruen*. Silencers are neither

dangerous, nor unusual. Silencers serve the dual purpose of reducing noises that harm and disorient the user and reduce rise, recoil, and muzzle blast of the firearm—all actions that make an otherwise lawful firearm safer and a more effective self-defense tool in the home. Research has repeatedly shown that silencers are rarely ever used to commit crimes, are legal to own in almost every state, and are so commonplace in gun collections that their possession has become ubiquitous with firearm ownership in the United States.

*Third*, the government has provided no evidence of relevantly similar founding era regulations prohibiting possession of unregistered silencers or analogous firearms. There were *no* requirements to register personal firearms with the federal or state governments until the Twentieth Century, over a century after the Second Amendment was ratified. There were no founding era regulations that imposed a lifetime ban on firearm ownership if a person failed to fill out paperwork and pay a tax on a personally owned firearm.

Instead, government's proffered historical regulations are not relevantly similar to the silencer restriction in § 5861(d). Historical regulations governing the commerce concerning firearms are not

relevantly similar because § 5861(d) does not regulate commercial conduct in any way, it prohibits the personal possession of a firearm in a person's own home for self-defense. As this instant case shows, § 5861(d) applies when a person makes a homemade silencer at their rural residence and never removes the silencer from their residence or uses the silencer to commit any crime. Historical regulations concerning dangerous or unusual weapons are also inapplicable here because, as explained above, silencers are neither dangerous, nor unusual.

Alternatively, § 5861(d) is unconstitutional as applied to Comeaux, who was a 48 year old, non-felon, gun collector who made homemade silencers in the privacy of his own rural residence. There is no historical basis for prohibiting a person, who was not otherwise prohibited from possessing firearms, from possessing a homemade device that would act to make his otherwise lawful firearms safer and more effectively used for self-defense.

This Court should hold that 26 U.S.C. § 5861(d) as applied to silencers is facially unconstitutional under the Second Amendment or, alternatively, that it is unconstitutional as applied to the appellant Brennan James Comeaux

## ARGUMENT

**I.    26 U.S.C. § 5861(d) facially violates the Second Amendment because possessing unregistered silencers is protected by the plain text of the Amendment, and the government cannot show a historical tradition of prohibiting possession of unregistered silencers**

Comeaux was convicted of possessing firearm silencers that were not registered with the Treasury, in violation of 26 U.S.C. § 5861(d). *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) and *United States v. Rahimi*, 144 S. Ct. 1889 (2024) set forth the framework for assessing the constitutionality of firearms restrictions. Under *Bruen*, the first question is whether the challenged conduct is covered by the plain text of the Second Amendment. If so, the law is presumptively unconstitutional and the burden shifts to the government to provide evidence that the restriction is consistent with this Nation's historical tradition of firearm regulation. Because the government cannot meet this burden, this Court should hold § 5861(d)'s prohibition of possessing unregistered silencers unconstitutional and vacate Comeaux' conviction.

## A.    Standard of review

Comeaux challenged the constitutionality of § 5861(d) below. ROA.29. Although Comeaux pled guilty, his plea was conditional and the government agreed, in the plea agreement, that:

> United States acknowledges that this is a conditional plea pursuant to Federal Rules of Criminal Procedure 11(a)(2), and that Brennan Comeaux reserved his right to appeal the Court's adverse ruling as to his Motion to Dismiss and, should such appeal be successful, Brennan Comeaux shall be allowed to withdraw his guilty plea.

ROA.132. Nevertheless, a guilty plea does not bar a criminal defendant from later appealing his conviction on the ground that the statute of conviction violates the Constitution. *Class v. United States*, 583 U.S. 174 (2018). The Court reviews constitutional challenges to a statute *de novo*. *United States v. Clark*, 582 F.3d 607, 612 (5th Cir. 2009).

A facial challenge to the constitutionality of a statute is the "most difficult challenge to mount successfully," because it requires a defendant to "establish that no set of circumstances exists under which the Act would be valid." *Rahimi*, 144 S. Ct. at 1898 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

### B.    The National Firearms Act

In 1934, Congress passed the National Firearms Act (NFA), an "especially restrictive regime [that] resulted from panic over gangster-related violence and thus was instituted to regulate 'weapons likely to be used for criminal purposes.'" *Mock v. Garland*, 75 F.4th 563, 570 (5th Cir. 2023); *see also Haynes v. United States*, 390 U.S. 85, 87 n.4 (1968). These weapons included machine guns, short-barreled shotguns, short-barreled rifles, other automatic firearms, mufflers and silencers, and other firearms—except pistols and revolvers. *Haynes*, 390 U.S. at 87. "The National Firearms Act is drafted in a peculiar manner," *United States v. Anderson*, 885 F.2d 1248, 1250 (5th Cir. 1989) (en banc), and its inclusion of silencers was striking because no actual data or information was presented as to the use of silencers for lawful or unlawful purposes.[1] The congressional record behind the NFA is devoid of any discussion or data

---

[1] *See* Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 Cumb. L. Rev. 33, 49-50 (2016) (The 1934 NFA "hearings closed without a single reference to any incident of the criminal misuse of a muffler or silencer, and the only reference to one in a negative light being Rep. Fuller's offhand inclusion of them with firearms being carried for an unlawful purpose. The hearing record amounted to 166 pages.") (citing to *National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means*, 73rd Cong. 1, 111 (1934)); See also *To Regulate Commerce in Firearms: Hearings on S. 855, S. 2258, and S. 3680 Before a S. Comm. on Commerce*, 73rd Cong. (1934) (same).

as to whether criminal misuse of silencers existed, or of the lawful purposes of silencers used in sporting, hunting, and self-defense to protect against hearing loss and noise pollution

The NFA is part of the Internal Revenue Code and imposes a tax on the manufacture, import, and distribution of the listed weapons above and requires a registry of these firearms with the Secretary of the Treasury or his/her delegate. *Haynes*, 390 U.S. at 88. The Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) collects the taxes and maintains NFA's weapon registration records in a central registry known as the National Firearms Registration and Transfer Record (NFRTR). 26 U.S.C. § 5841(a).

Pursuant to the NFA, a silencer is classified as a firearm. 26 U.S.C. § 5845(a) ("The term "firearm" means... (7) any silencer (as defined in section 921 of title 18, United States Code)); *see also* 18 U.S.C. § 921(a)(3)(C) ("'[F]irearm' means... any firearm muffler or firearm silencer"); *see also* 18 U.S.C. § 921(a)(25) ("The terms 'firearm silencer' and 'firearm muffler' mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or

fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.").

By being defined as a "firearm" under the NFA, silencers are subject to the same initially prohibitive and onerous requirements involving taxation, registration, and approval by the government that apply to machine guns. To possess a silencer, they must first be registered in the NFRTR; a $200 tax must be paid; the applicant must submit their fingerprints and photograph, along with other information; obtain a certificate by local or state law enforcement (if making or transferring); and then wait several months for approval by ATF. 26 U.S.C. § 5811(a), 5812(a), 5822; 27 C.F.R. § 479.63, 479.85.

Under the NFA it is "unlawful for any person… to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." 26 U.S.C. § 5861(d). Violation of the NFA subjects a person to a fine of $10,000 and ten years imprisonment. 26 U.S.C. § 5871. Conviction of any provision of the NFA then further subjects the individual to the lifetime relinquishment of their Second Amendment right.

**C.     Comeaux was convicted under a statute, 26 U.S.C. § 5861(d), that is unconstitutional as applied to silencers**

The Second Amendment to the United States Constitution mandates that a "well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. CONST. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570, 630 (2008), the Supreme Court held that the Second Amendment codifies an individual right to possess firearms, the "central component" of which is self-defense. *See Bruen*, 142 S. Ct. at 2133 (citing *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010)).

In *Bruen*, the Supreme Court announced a new framework for analyzing Second Amendment claims, abrogating the two-step inquiry previously adopted by this Court and others. Under *Bruen*'s framework, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. The government then "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Only then may a court conclude that the individual's conduct falls outside of the Second Amendment's "unqualified command." *Id.*

In *Rahimi*, the Supreme Court further clarified the historical tradition analysis:

> As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. A court must ascertain whether the new law is "relevantly similar" to laws that our tradition is understood to permit, "apply[ing] faithfully the balance struck by the founding generation to modern circumstances." Discerning and developing the law in this way is "a commonplace task for any lawyer or judge."

*Rahimi*, 144 S. Ct. at 1898 (brackets in original) (citations omitted). *Rahimi* further provided that "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id.* The *Rahimi* Court cautioned, however, that "[e]ven when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Id.*

1.  **The Second Amendment covers the conduct prohibited by § 5861(d): possession of unregistered silencers**

    a.  **Silencers are "arms" under the plain text of the Second Amendment**

The Second Amendment protects "the right of the people to keep and bear Arms ...." U.S. CONST. amend. II. The plain text—"keep and bear arms"—means possessing and carrying weapons. *Heller*, 554 U.S. at 583-92. *Bruen* clarified that the core right to possess and carry a firearm for self-defense, identified in *Heller* and *McDonald*, extends outside the home. 142 S. Ct. at 2122. Silencers are "arms" under the Second Amendment. Section § 5861(d) therefore infringes upon the core Second Amendment right to possess a firearm for self-defense. *See McDonald*, 561 U.S. at 767.

Silencers constitute "arms" as indicated by *Heller's* definition,[2] historical research, and by the plain meaning given to the federal statutes that define silencers as firearms. *Heller* defined "arms" as "weapons of offence, or armour of defence" and "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast

---

[2] *But see United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018), where the Tenth Circuit in a pre-*Bruen* decision summarily held that silencers fall outside the Second Amendment because a silencer is a firearm accessory, not a weapon in itself.

at or strike another." 554 U.S. at 581. These broad definitions would apply to "bows and arrows," *see id.,* and therefore, its application to a silencer should not be contentious. A man can take a silencer "into his hands" and can use the instrument in "wrath to strike another." *Id.* Further, a silencer can be used as a defensive or offensive weapon. This is true regardless of whether it is attached to another weapon.

*Rahimi* reiterated that "the reach of the Second Amendment is not limited only to those arms that were in existence at the founding, …[r]ather it 'extends, prima facie, to all instruments that constitute bearable arms, even those that were not [yet] in existence.'" 144 S. Ct. at 1897. Because silencers are "instruments that constitute bearable arms," they receive Second Amendment protection even though they did not exist at the founding. *Id.*

Also, silencers deserve Second Amendment protection as a modern-day analogue to the various firearm accessories historically considered to be "arms" for Second Amendment purposes. At the time of the founding, "arms" included the "proper accoutrements" or related items and accessories that rendered the firearm as useable. *United States v. Miller*, 307 U.S. 174, 182 (1939). Historically, this would include ammunition,

18

bayonets, and other equipment such as "cartridge box[es]," "a sufficient belt," "two spare flints," and "a good knapsack and canteen." *Id.* at 181. Further historical research reveals that militiamen were required to carry items that went well beyond the firearm and ammunition. *See* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 497 (2019). Such accoutrements included "gun-cleaning equipment," such as brushes, wires, and screw drivers; holsters and scabbards for "carrying and storage"; and items used to keep firearms from decaying, such as a "cover" to "protect[] the gun lock from the elements" and wax to "protect firearms from rain." *Id.* at 497, 521-23. These objects were "necessarily part of the Second Amendment right, since they are necessary to the use of arms." *Id.* at 511-12.

At least one member of this Court has recognized that "protected Second Amendment 'conduct' likely includes making common, safety-improving modifications to otherwise lawfully bearable arms." *Mock*, 75 F.4th at 588 (Willett, J., concurring). The Fourth Circuit has adopted this view in finding that "'arms' should be read to protect all those items necessary to use the weapons effectively." *Kolbe v. Hogan*, 813 F.3d 160,

175 (4th Cir. 2016), *vacated on reh'g en banc on other grounds*, 849 F.3d 114 (4th Cir. 2017). In rejecting the State's argument that 'detachable magazines are not firearms,' the Court stated, "the right to possess firearms for protection implies a corresponding right to possess component parts necessary to make the firearms operable." *Id.* If it were not so, the government could "circumvent *Heller*, … simply by prohibiting possession of individual components of a handgun, such as a firing pin. But of course, without the ability to actually fire a gun, citizens cannot effectively exercise the right to bear arms." *Id.*

Similarly, the Seventh Circuit has recognized that the Second Amendment extends to "corollar[ies] to the meaningful exercise of the core right to possess firearms for self-defense." *Wilson v. Cook County*, 937 F.3d 1028, 1032 (7th Cir. 2019) (internal citations omitted). The Third Circuit also recognized the importance of this corollary and found that "a magazine is an arm under the Second Amendment" because it was "an implement that goes into the weapon to increase the capacity of the weapon itself." *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of New Jersey*, 910 F.3d 106, 116 (3rd Cir. 2018). The "necessary to use" and "corollaries to the meaningful exercise to possess firearms" principles

compel the conclusion that silencers are "arms" within the meaning of the Second Amendment as they improve the safety and efficacy of lawful firearms use.

First, silencers were invented to reduce noises that harm and/or annoy both the user and those within the vicinity of such use. *See* Hiram Percy Maxim, *Forward* to Hiram Percy Maxim, *Experiences with the Maxim Silencer* 2 (1915).[3] Scientific research demonstrates that firearms generate sound pressure levels ("SPL") that can permanently damage a user's hearing. Brian J. Fligor, *Prevention of Hearing Loss from Noise Exposure*, Better Hearing Institute 3 (2011) ("A single shot from a large caliber firearm, experienced at close range, may permanently damage your hearing in an instant"). The World Health Organization recommends that "adults should never be exposed to more than 140 dB(lin) peak sound pressure level," and children should not be exposed to more than 120 dB(lin). World Health Organization, *Guidelines for Community Noise*, 45 (1999)[4]. The U.S. Occupational Safety and Health Administration ("OSHA") and the National Institute for Occupational

---

[3]     Available     at     http://www.silencerresearch.com/maximletters.pdf     (last accessed August 30, 2024).

[4] Available at https://www.who.int/publications/i/item/a68672 (last accessed on August 30, 2024).

Safety and Health ("NIOSH") incorporate a peak limit of 140 decibels SPL for occupational noise exposures. *See* 29 C.F.R. § 1910.95. The peak sound pressure levels from firearms exceed these recommended limits.[5] Silencers are recognized as an instrument that helps reduce the risk of hearing loss and other health problems associated with exposure to firearm noise. Michael Stewart et al., *National Hearing Conservation Association Position Statement: Recreational Firearm Noise* 1 (March 2017).[6]

---

[5] Almost all firearms create noise that is over the 140-dB level." Michael Stewart, *Recreational Firearm Noise Exposure*, American Speech-Language-Hearing Association, available at http://www.asha.org/public/hearing/Recreational-Firearm-Noise-Exposure (last accessed August 30, 2024) ("small-caliber rifles, air rifles, shotguns, and pistols can generate noise up to 140 decibels peak pressure level…higher-caliber rifles can produce sounds over 175 dBP"). The Department of Defense places gunshots in the 160-170 decibels range. *See* https://hearing.health.mil/Prevention/How-Loud-is-Too-Loud (last accessed August 30, 2024. As a result, exposure to gunfire "not only lead[s] to hearing loss and tinnitus"—a ringing in the ear that can become permanent—"but also contribute[s] to the development of numerous other health issues, including sleep disturbance, cardiovascular disease, and diabetes," as well as communication interference, "stress, anxiety, high blood pressure, gastro-intestinal problems, and chronic fatigue." Jay M. Bhatt et al., *Epidemiology of Firearm and Other Noise Exposures in the United States*, Laryngoscope, 127:E340–E346 (March 2017); *see also* World Health Organization, *Guidelines for Community Noise*, 21-34 (1999); Halbrook, *supra* note 1 at 34 ("[A]t the top of the list of service-connected disabilities of all military veterans appears "tinnitus," or ringing in the ear (1,121,709 vets) and hearing loss (854, 855)").

[6] Available at https://www.hearingconservation.org/assets/docs/NHCA_position_paper_on_firea.pdf. (last accessed August 30, 2024. The Centers for Disease Control ("CDC") has recommended the use of silencers to reduce the unacceptably high levels of noise exposure at shooting ranges. Brueck SE, et al., National Institute for Occupational Safety and Health ("NIOSH"), *Health Hazard Evaluation Report: Measurement of Exposure to Impulsive Noise at Indoor and Outdoor Firing Ranges During Tactical*

Second, in addition to the health benefits, silencers also reduce the rise, recoil, and muzzle blast of the firearm. Justin Stevens ("Stevens"), *Reloading the Second Amendment: The Undue Burdens of the National Firearms Act and Their Remedies*, 49 Tex. Tech L. Rev. Online Edition 149, 164 (2017); *see also* Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 Cumb. L. Rev. 33, 69 (2016). These all aid in the firearm owner's ability to practice self-defense as accuracy is improved and "[a]ccuracy, in turn, promotes safety." *Mock*, 75 F.4th at 588 (Willett, J., concurring); *see also id.* ("Even for attachments that convert a pistol into a rifle under the statutes, ATF has not identified any historical tradition of requiring ordinary citizens to endure a lengthy, costly, and discretionary approval process just to use accessories that make an otherwise lawful weapon safer.").

Further, firing a weapon without a silencer in a small, closed area, i.e., a bedroom, can permanently damage hearing due to the noise (generally above recommended hearing thresholds) being reflected back

---

*Training Exercises* 14, HHE Report 2013-01243208, available at http://www.cdc.gov/niosh/hhe/reports/pdfs/2013-0124-3208.pdf (last accessed August 30, 2024) ("If feasible and legally permissible, attach noise suppressors to firearms to reduce peak sound pressure levels.").

at the shooter at close range. This would also result in immediate disorientation. A silencer significantly reduces this risk, giving the firearm owner greater protection and time to defend against an attack.

Accordingly, silencers are like gun-cleaning equipment, holsters, and other items deemed incidental to service in the militia—cartridge boxes for ammunition, canteens, knapsacks, and bayonets—all considered at the founding to be "arms" under the Second Amendment. These items were "necessary to use… weapons effectively," *Kolbe I*, 813 F.3d at 175 and make an "otherwise lawful weapon safer." *Mock*, 75 F.4th at 588 (Willett, J., concurring). Silencers are necessary for the protection of the shooter and bystanders' hearing and silencers make self-defense—particularly in the home—effective.

Last, some attention must be given to the statutes regulating silencers that have intentionally chosen to define silencers as "firearms." The NFA originally identified silencers as "firearms" among certain other narrow categories of guns. *See* 26 U.S.C. § 5845(a) ("The term 'firearm' means… (7) any silencer"). Under Title I of the Gun Control Act ("GCA"), a silencer is defined as a "firearm." 18 U.S.C. § 921(a)(3) provides in part: "The term 'firearm' means… (C) any firearm muffler or firearm

silencer…" Courts are to give laws their plain, unambiguous meaning. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). Both the NFA and the GCA are clear in identifying silencers as firearms. The government even agreed in this case that the silencers in question were firearms under the law. ROA.143. If silencers are to be regulated as Second Amendment conduct by the federal government, then they also deserve Second Amendment scrutiny.

### b.    Alternatively, silencers are implicitly protected under the Second Amendment

Like all enumerated constitutional provisions, the Second Amendment contains both explicit and implicit guarantees. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 579 (1980) ("[T]he Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees."). If an unarticulated right is "indispensable to the enjoyment of [a] right[] explicitly defined," it will "share constitutional protection in common with [the] explicit guarantee[]." *Id.* Circuit courts have applied this principle to Second Amendment claims. For example, in *Ezell v. City of Chicago*, a Chicago ordinance that prohibited private citizens from using shooting ranges within city limits was challenged. 651 F.3d 684, 691-92 (7th Cir. 2011). The Seventh Circuit

began by asking "whether range training is categorically unprotected by the Second Amendment." *Id.* at 704. In finding it was not, the Court determined that it would be worthless to have the right to own a gun for self-defense if the owner lacked the ability to practice using it. "The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." *Id.* Likewise, the Ninth Circuit has held that "the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). In an earlier case, the Ninth Circuit held that an ordinance that banned the sale—but not possession—of certain bullets infringed upon a gun owner's Second Amendment rights because "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014).

This same logic applies to silencers. As discussed above, using silencers not only provides considerable health benefits to the shooter and those within the vicinity of the shots, but they also improve accuracy

and reduce disorientation after firing. Accordingly, if the Second Amendment protects the right to use a gun for self-defense in the home as *Heller* held, then it must also protect the "corresponding right" to do so without incurring permanent hearing loss or other serious health risks. *Ezell*, 651 F.3d at 704; *Jackson*, 746 F.3d at 967.

> **2.    The government cannot show that § 5861(d)'s silencer prohibition addresses a "general societal problem" as required by *Bruen* because silencers are neither dangerous nor unusual**

Because the Second Amendment presumptively protects the conduct prohibited by § 5861(d) (possessing unregistered silencers), the *Bruen* framework first requires the government to indicate the "general societal problem" that § 5861(d) addresses—either one that "has persisted since the 18th century" or one that is "unprecedented" and not conceivable at the founding. *Bruen*, 142 S. Ct. at 2131-32. The government argued below that silencers are "dangerous and unusual weapons," subject to Second Amendment restrictions. ROA.46-48. The court below denied Comeaux's challenge by finding the same. ROA.58-59. As discussed above, the government cannot clear this preliminary hurdle, as silencers did not pose a problem in the past and do not pose a problem today. Silencers are neither dangerous, nor unusual.

Possession and ownership of silencers is currently legal in 42 states with 41 states legalizing their use for hunting.[7] This Nation's current tradition on silencers appears overwhelmingly clear, "the national consensus is that firearm suppressors are not a threat to society worth heavily regulating." Stevens at 175. In fact, the use of silencers to commit crimes is rare. Data from the ATF shows that between 2012-2015, only 390 silencers were recovered from crime scenes where a trace was requested—compared to more than 600,000 pistols in the same period. Nathan Rott, *Debate Over Silencers: Hearing Protection or Public Safety Threat?*, All Things Considered (NPR Mar. 21, 2017).[8] A more recent ATF report shows an even smaller number. From 2017-2021 silencers were not identified in the "types of traced crime guns" category, suggesting a negligible amount. ATF, *Part III: Crime Guns Recovered and Traced Within the United States and Its Territories.*[9] As to traced "privately made firearms" or "PMFs," only 345 silencers, or less than 1 % of total

---

[7]   *See* American Suppressor Association, *Education,* available at https://americansuppressorassociation.com/education (last accessed August 30, 2024) (Of the states where silencers are legal, only Connecticut prohibits hunting with a silencer).

[8]   Available at http://www.npr.org/2017/03/21/520953793/debate-over-silencers-hearingprotection-or-public-safety-threat (last accessed August 30, 2024).

[9]   Available at https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-iii-crime-guns-recovered-and-traced-us/download (last accessed August 30, 2024).

PMFs, were recovered over the four-year period compared to 22,546 pistols. *Id.* at 21.

Further, a former second in command at ATF, Ronald Turk, made an evidence and statistical based argument for the deregulation of silencers. Ronald Turk, *White Paper: Options To Reduce Or Modify Firearms Regulations* 6 (January 2017).[10] This included the fact that the ATF recommended only 44 prosecutions a year for silencer-related violations in the past 10 years; of the 44 defendants approximately 6 had prior felony convictions; and "silencers are very rarely used in criminal shootings." *Id.* In addition to not being a public safety threat, Turk admitted that silencers account for the vast majority of NFA applications and revealed that "ATF's processing time is now approximately 8 months," and that the Bureau has had to devote "substantial resources" to address the backlog. *Id.*

Turk's statistics are also supported by a comprehensive, empirical study on the issue which concluded that "use of silenced firearms in crime is a rare occurrence, and is a minor problem." P. Clark, *Criminal Use of*

---

[10] Available at https://s3.documentcloud.org/documents/4378420/ATF-White-Paper-3.pdf (last accessed August 30, 2024).

*Firearm Silencers*, 8 W. Crim. Review 44, 53 (2007). This study showed that in comparison with firearms without silencers, silencer-equipped guns are "only one-third as likely to be used to kill or injure, one-half as likely to be actively employed, and one-half as likely to be used by someone with a prior record." *Id.* Thus, guns with silencers are not more dangerous or likely to be used by professional criminals or repeat offenders.

Despite their exceedingly rare use by criminals, suppressors are becoming ubiquitous with firearm ownership in the United States:

> Unlike the registry growth rate of S[hort] B[arrel] R[ifle]s, suppressor popularity has followed an astronomical trajectory in the years since *Heller*. In 2011, Americans owned a meager 285,087 suppressors. By 2020, that number had risen sevenfold to 2,042,719. Then, in just one year's time, that number rocketed to 2,664,774 in 2021--an increase of over 600,000 suppressors or 30 percent. With millions of suppressors already registered and a vibrant, streamlined marketplace in existence, suppressors are becoming ubiquitous in modern firearm ownership.

Oliver Krawczyk ("Krawczyk"), *Dangerous and Unusual: How an Expanding National Firearms Act Will Spell Its Own Demise*, 127 Dick. L. Rev. 273, 298-99 (2022) (citations omitted).

It is also worth noting that multiple bills have been currently introduced in Congress to deregulate silencers. The "Hearing Protection

Act" has been introduced in the early months of 2023 in both the Senate and the House—S.401 and H.R. 152 respectively.[11] Both bills seek to remove silencers from the definition of "firearms" for purposes of the NFA. Also, Senator Mike Lee recently introduced "Silencers Helping Us Save Hearing Act (SHUSH Act)," which seeks to deregulate silencers at the federal level and preempt state laws that regulate, tax, or prohibit the possession of silencers.[12] Specifically, the SHUSH Act would remove silencers from the NFA and the GCA.

In sum, § 5861(d), with respect to silencers, is a solution to a problem that does not exist and was not shown to exist when it was included within the NFA in 1934 without any data or information. This Court can invalidate § 5861(d) on this basis alone, as *Bruen* permits only those gun regulations that "address a general societal problem." 142 S. Ct. at 2131.

---

[11]   *See* https://www.congress.gov/bill/118th-congress/senate-bill/401   and https://www.congress.gov/bill/118th-congress/house-bill/152.

[12] *See* https://www.congress.gov/bill/117th-congress/senate-bill/1101.

### 3. There is no evidence of "relevantly similar" founding-era regulations prohibiting the possession of unregistered silencers

Because the Second Amendment presumptively protects the possession of an unregistered silencer, the *Bruen* framework also requires the government to "justify its regulation by demonstrating that it is consistent with the "Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130, and "the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898.

*First*, regarding temporal proximity to the founding era, "when it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634-35; emphasis in *Bruen*). "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions change in the intervening years."[13] *Id.* Similarly, the Court explained that "we must also guard

---

[13] The Fourteenth Amendment was implicated in *Bruen* because the Fourteenth Amendment imposes the Second Amendment's pronouncement on a state regulation or law. The Supreme Court did not hold for a challenge to a federal statute that regulations from around the passage of the Fourteenth Amendment, or 1868,

against giving post-enactment history more weight than it can rightly bear." *Id.* The Court expressed skepticism about reliance on laws passed long after the passage of the Second Amendment and explained, "to the extent later history contradicts what the text says, the text controls." *Id.* at 2137.

*Second*, the founding-era historical precedent must be comparable to the challenged regulation. How similar the historical precursors must be to the challenged law depends on the societal problem it seeks to address. When "a challenged regulation addresses a general societal problem that has persisted since the 18th century," the government must identify distinctly similar historical regulations. *Bruen*, 142 S. Ct. at 2131. The "lack of a distinctly *similar* historical regulation addressing that problem" or evidence that earlier generations addressed the societal problem through materially different means "is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* (emphasis added). The total handgun ban in *Heller* and public-carry

---

would carry the same weight as those from around ratification of the Second Amendment, or 1791. *See Bruen*, 142 S. Ct. at 2137–38; *see also id.* at 2163 (Barrett, J., concurring). Indeed, *Bruen* acknowledged that 19th century evidence was secondary to that from the Nation's founding, *see id.* at 2137, and its value is likely even more limited when addressing a federal statute.

restriction in *Bruen* involved this type of "straightforward" historical inquiry. *Id.* In *Rahimi*, the Supreme Court employed the "relevantly similar" test to § 922(g)(8), the ban on possession of a firearm while subject to a domestic violence restraining order.

*Third*, the government must show "a *tradition* of broadly prohibiting" conduct in the manner of the challenged restriction. *Bruen*, 142 S. Ct. at 2138 (emphasis added). In other words, the founding-era historical evidence must show "a governmental practice has been open, widespread, and unchallenged since the early days of the Republic." *Id.* at 2137 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)). The government cannot "simply posit that the regulation promotes an important interest." *Id.* at 2126. Nor can it rely on "outlier" historical restrictions. *Id.* at 2133, 2156. Indeed, *Bruen* "doubt[ed] that *three* colonial regulations could suffice to show a tradition[.]" *Id.* at 2142. But in *Rahimi*, the Court relied on historical surety and going armed laws to find that there was a historical tradition of temporarily disarming those who pose a clear threat of physical violence to another person. *Rahimi*, 144 S. Ct. at 1901-03.

a. **There is no evidence of "relevantly similar" founding-era regulations requiring registration and taxation of firearms or silencers**

Until the early 1900s, there were no requirements to register *any* firearm with the federal or state governments. Again, "when it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*'" *Bruen*, 597 U.S. at 4 (quoting *Heller*, 554 U.S. at 599) (emphasis original). And "because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Id.* at 36 (quoting *Heller*, 554 U.S. at 614). So, "we must ... guard against giving postenactment [sic] history more weight than it can rightly bear." *Id.* at 35.

With that in mind, the government's discussion of Twentieth Century regulations do little to validate the silencer restriction in § 5861(d). By the time of NFA's enactment in 1934, only 11 states had

passed registration statutes with the first of these taking effect in 1911.[14]

120 years had passed between the enactment of the Second Amendment

and the first of these firearm registration statutes. In *Bruen*, the Court

declined to even "address any of the 20th-century historical evidence

brought to bear by respondents" because it did "not provide insight the

meaning of the Second Amendment when it contradicts earlier evidence."

142 S. Ct. at 2153 n.28.

---

[14] 1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 2; 1913 Mich. Pub. Acts 472, An Act Providing for the Registration of the Purchasers of Guns, Pistols, Other Firearms and Silencers for Firearms and Providing a Penalty for Violation, § 1; 1917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person § 7; 1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slingshot, Billy club, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, § 5; 1931 Ill. Laws 453, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 4; 1933 Wyo. Sess. Laws 117, An Act Relating to the Registering and Recording of Certain Facts Concerning the Possession and Sale of Firearms by all Wholesalers, Retailers, Pawn Brokers, Dealers and Purchasers, Providing for the Inspection of Such Register, Making the Violation of the Provisions Hereof a Misdemeanor, and Providing a Penalty Therefor, ch. 101, §§ 1-4; 1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8; 1931-1933 Wis. Sess. Laws 245-47, An Act . . . Relating to Machine Guns and to Make Uniform the Law with Reference Thereto, ch. 76, § 1, pt. 164.01 to 164.06; 1933 Haw. Sess. Laws 36-37, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 3; 1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 1-7.

Moreover, the registration statutes identified are "outliers" at most. *Bruen*, 142 S. Ct. at 2153. The *Bruen* Court rejected the notion that statutes from three of the original colonies—or roughly 23%— "could suffice to show a tradition" of firearm regulation. *Id.* at 2142. Similarly, 11 states out of 48 (the number of states admitted to the Union as of 1912) also make up 23% of the total. Therefore, a similar conclusion can be drawn that these 20th century registration statutes are not "representative" in the way that *Bruen* demands. *Id.* at 2133. The government has failed its burden to "justify its regulation by demonstrating that it is consistent with the "Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

But this Court should not ignore the dearth of silencer regulation in the past century. Possession and ownership of silencers is currently legal in 42 states.[15] Ownership of silencers in the United States has skyrocketed since *Heller*, with registered silencers increasing from 285,087 suppressors in 2011 to 2,664,774 in 2021. Krawczyk at 298-99. Unlike many other types of firearms restricted by § 5861(d), there is,

---

[15] *See* American Suppressor Association, *Education,* available at https://americansuppressorassociation.com/education (last accessed August 30, 2024) (Of the states where silencers are legal, only Connecticut prohibits hunting with a silencer).

simply put, no historical regulatory evidence to support the restriction on silencers.

> **b.** **There is no evidence of "relevantly similar" founding-era regulations creating a lifetime disarmament of someone who failed to fill out paperwork and pay a tax**

As failure to comply with the silencer registration regime in § 5861(d) is "a felony, a violation may also lead to a lifetime ban on ownership of firearms" *Mock*, 75 F.4th at 571 (citing to 18 U.S.C. § 922(g)(1)). The Supreme Court in *Rahimi* emphasized that "why and how" a regulation burdens the Second Amendment right "are central to this [historical] inquiry." 144 S. Ct. at 1898. "Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Id.* Thus, even if it may be permissible to require registration of certain firearms, if the punishment is lifelong disarmament for failure to register, then that is not compatible with firearm regulations at the founding. This was made most evident in the Court's decision to uphold 18 U.S.C. § 922(g)(8)(C)(i) because "like surety bonds of limited duration, Section 922(g)(8)'s restriction was temporary as applied to Rahimi. Section 922(g)(8) only prohibits firearm possession so long as the

defendant 'is' subject to a restraining order." *Id.* at 1902 (emphasis added). Accordingly, the Supreme Court considers the length of a Second Amendment deprivation to be a critical feature of the historical-analogue analysis.

Yet Comeaux's failure to fill out paperwork and pay a tax under § 5861(d) is not the type of conduct that would have historically resulted in the permanent deprivation of gun rights. In other words, the "why" of the firearm regulation is the victimless violation of failing to abide by an administrative process that results in lifelong relinquishment of the individual's Second Amendment right. *See also Mock*, 75 F.4th at 588 (Willett, J., concurring) (recognizing that the "ATF has not identified any historical tradition of requiring ordinary citizens to endure a lengthy, costly, and discretionary approval process just to use accessories that make an otherwise lawful weapon safer.").

This is unlike *Rahimi*, where the Supreme Court held that "the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others." *Rahimi*, 144 S. Ct. at 1898. Rahimi's temporary disarmament was upheld because a lower court had found that Rahimi represented "'a credible threat to the

physical safety' of another," and this matched founding laws that also involved judicial determinations of individuals and whether they were likely to threaten another with a weapon. *Id.* at 1901-02. Yet there are no founding laws that resulted in the permanent disarmament of an individual who failed to register and pay a tax on a weapon. The government has failed its burden to "justify its regulation by demonstrating that it is consistent with the "Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

> **c.  Historical laws regulating commerce surrounding firearms are not "relevantly similar" to § 5861(d)'s prohibition on personal possession of a silencer**

The government primarily argued below that that historical laws that regulated commerce concerning firearms are relevantly similar to § 5861(d)'s prohibition of possessing an unregistered silencer. ROA.48-51. In support the government cited to numerous historical laws regulating the *selling* of firearms. The government's argument fails because § 5861(d) does not regulate commerce in any way; it does not prohibit selling a silencer, only the receipt or possession a silencer. A law-abiding gun collector violates § 5861(d) if he uses an empty recycled plastic bottle to create a homemade silencer in the privacy of his own home. No

commerce necessary. Perhaps the historical tradition of regulating commerce concerning firearms would be relevantly similar to a modern restriction on the selling and distribution of silencers, *see* § 5861(a), but that is not what § 5861(d) prohibits. Such laws are not "relevantly similar." The government has failed its burden to "justify its regulation by demonstrating that it is consistent with the "Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

* * * * *

Because the government has failed to identify any "relevantly similar" laws from the founding that demonstrate a broad tradition of prohibiting personal possession of an unregistered silencer, it has failed to meet its burden under *Bruen*. This Court should therefore hold that § 5861(d) as applied to silencers facially violates the Second Amendment.

## II.   26 U.S.C. § 5861(d)'s prohibition on possession of unregistered silencers violates the Second Amendment as applied to Comeaux, an avid gun collector who possessed homemade silencers at his rural residence for self-defense

### A.   Standard of review

Comeaux challenged the constitutionality of § 5861(d) below by filing a motion to dismiss the indictment arguing that 26 U.S.C. § 5861(d) violated the Second Amendment as applied to someone who "is not a

41

prohibited person prevented from possessing firearms under federal or state law" and who "built his own firearm suppressors, five in total, and did not register them or identify them by serial number as required by federal law." ROA.29-39.

Although Comeaux pled guilty, his plea was conditional and the government agreed, in the plea agreement, that:

> United States acknowledges that this is a conditional plea pursuant to Federal Rules of Criminal Procedure 11(a)(2), and that Brennan Comeaux reserved his right to appeal the Court's adverse ruling as to his Motion to Dismiss and, should such appeal be successful, Brennan Comeaux shall be allowed to withdraw his guilty plea.

ROA.132. Nevertheless, a guilty plea does not bar a criminal defendant from later appealing his conviction on the ground that the statute of conviction violates the Constitution. *Class*, 583 U.S. 174. Constitutional questions receive de novo review. *United States v. Connelly*, No. 23-50312, --- F.4th ----, 2024 WL 3963874, at *2 (5th Cir. Aug. 28, 2024).

## B.   Argument

As applied to Comeaux, § 5861(d) restricts his Second Amendment rights more than would any historical and traditional laws. When he possessed the homemade silencers in this case, Comeaux was 48 years old and was not in any way prohibited from owning firearms under

42

Louisiana or federal law. He was not a felon and did not have any prior convictions for violent conduct.

He owned dozens of antique and modern shotguns, rifles, and pistols, along with various firearms accessories and fabrication tools. Comeaux's gun collection included five silencers that Comeaux made because "he needed them for protection from his neighbors." ROA.151-52. Comeaux possessed his guns at his personal residence for self-defense. He made the silencers himself and they remained in his possession at his residence at all times. His homemade silencers never entered interstate commerce, nor were they ever used in any criminal activity.

The government has proffered no historical regulation that would prohibit a private citizen like Comeaux from possessing a homemade silencer in his own home for self-defense. There are no historical regulations prohibiting the personal in-home possession of a firearm that serves to improve the safety of Comeaux's other firearms and increase the effectiveness of their use in a self-defense situation. *See supra* Part.I.C.2.b. Nor are there any historical regulations prohibiting the personal in-home possession of a type of firearm whose possession was

ubiquitous with firearm ownership in the United States. *See supra* Part.I.C.2.b.

The analogical reasoning *Bruen* and *Rahimi* prescribed cannot stretch as far as the government pushes in this case. By prohibiting Comeaux's possession of homemade silencers, possessed only in his rural residence, the government imposes a far greater burden on his Second Amendment rights than our history and tradition of firearms regulation can support.

## CONCLUSION

For the foregoing reasons, appellant Brennan James Comeaux respectfully requests that the Court vacate his conviction and sentence.

Respectfully submitted,

REBECCA L. HUDSMITH
Federal Public Defender

BY:   *s/ Dustin C. Talbot*
      DUSTIN C. TALBOT
      Appellate Chief
      Federal Public Defender's Office
      Middle and Western Districts of Louisiana
      102 Versailles Boulevard, Suite 816
      Lafayette, Louisiana 70501
      Telephone: (337) 262-6336

      *Attorney for the Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has this day been served by the 5th Circuit electronic filing system on the Assistant United States Attorney, on September 3, 2024.

*s/Dustin C. Talbot*
DUSTIN C. TALBOT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.  This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 8,816 words.

2.  This document complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century typeface with a 14 point font.

Lafayette, Louisiana, September 3, 2024.

*s/Dustin C. Talbot*
DUSTIN C. TALBOT