# UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

_____

**24-30307**

_____

## UNITED STATES OF AMERICA,

Plaintiff-Appellee

**v.**

## BRENNAN JAMES COMEAUX,

Defendant-Appellant

Appeal from the United States District Court for the
Western District of Louisiana
CRIMINAL NUMBER 6:23-CR-183-1

_____

## BRIEF ON BEHALF OF APPELLEE,
## THE UNITED STATES OF AMERICA

_____

BRANDON B. BROWN
United States Attorney
Western District of Louisiana

AUSTIN W. PIATT
Attorney, United States
Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C.
(202) 227-6370
Attorneys for Plaintiff-Appellee

## STATEMENT REGARDING ORAL ARGUMENT

The United States does not oppose the request for oral argument.

# TABLE OF CONTENTS

**PAGES**

STATEMENT REGARDING ORAL ARGUMENT ...................................i

TABLE OF AUTHORITIES....................................................................iv

STATEMENT OF JURISDICTION ..........................................................1

ISSUES ON APPEAL ...............................................................................2

STATEMENT OF THE CASE ...................................................................3

    *Statutory Background* ........................................................................3

    *Offense Conduct* ................................................................................4

    *District Court Proceedings* ...............................................................7

SUMMARY OF THE ARGUMENT ..........................................................8

ARGUMENT ..........................................................................................10

I.    Comeaux's Constitutional Claims Are Misplaced Because Silencers Are Not "Arms" Covered By The Second Amendment ..10

    A. Standard Of Review ....................................................................11

    B. Silencers Are Not "Arms" ...........................................................11

    C. Comeaux Cannot Show That Silencers Are "Arms" .................13

II.    Section 5861(d)'s Requirements For The Possession Of Firearm Silencers Are Facially Constitutional Under The Second Amendment ...................................................................................20

    A. Standard Of Review ....................................................................20

    B. Historical Tradition Supports Section 5861(d)'s Regulation Of Silencers .................................................................................20

        *1. Regulation Of Silencers Is Part Of The Traditional Regulation Of Dangerous And Unusual Devices* .................22

*2. Section 5861(d) Is Also Part Of The Historical Tradition Of Regulating Commerce Surrounding Firearms* ............... 33

*3. At A Minimum, Section 5861(d) Has Numerous Constitutional Applications That Preclude Facial Invalidation* ............................................................. 37

III.    Comeaux's As-Applied Challenge, Which Is Subject Only To Plain-Error Review, Lacks Merit ................................................. 38

A. Standard Of Review ............................................................. 38

B. Comeaux Cannot Show Section 5861(d) Is Plainly Unconstitutional As Applied To Him ................................... 40

CONCLUSION ..................................................................................... 43

CERTIFICATE OF SERVICE AND COMPLIANCE WITH ECF FILING STANDARDS ............................................................. 44

CERTIFICATE OF COMPLIANCE ....................................................... 45

# TABLE OF AUTHORITIES

**PAGES**

## Federal Cases

*Bailey* v. *Drexel Furniture Co.*, 259 U.S. 20 (1922)................................. 19

*Cox* v. *United States*, No. 11-CR-22, 2023 WL 4203261
 (D. Alaska June 27, 2023) .................................................................... 13

*Dep't of Transp.* v. *Ass'n of Am. Railroads*, 575 U.S. 43 (2015) ............. 19

*District of Columbia* v. *Heller*, 554 U.S. 570 (2008) ....................... *passim*

*Does 1-7* v. *Abbott*, 945 F.3d 307 (5th Cir. 2019) .................................... 39

*Friedman* v. *City of Highland Park,* 136 S. Ct. 447 (2015) .................... 30

*Immigration & Naturalization Serv.* v. *Chadha*, 462 U.S. 919 (1983) .. 17

*Int'l Women's Day March Planning Comm.* v. *City of San Antonio*,
 619 F.3d 346 (5th Cir. 2010)................................................................ 39

*Kolbe* v. *Hogan*, 813 F.3d 160 (4th Cir. 2016)......................................... 14

*Nat'l Fed'n of Indep. Bus.* v. *Sebelius*, 567 U.S. 519 (2012) ................... 19

*New York State Rifle & Pistol Ass'n, Inc.* v. *Bruen*,
 597 U.S. 1 (2022) ....................................................................... *passim*

*Richmond Newspapers, Inc.* v. *Virginia*, 448 U.S. 555 (1980) .............. 16

*Second Amend. Found., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms
 & Explosives*, 702 F. Supp. 3d 513 (N.D. Tex. 2023) ........................... 13

*United States* v. *Al-Azhari*, No. 20-CR-206, 2020 WL 7334512
 (M.D. Fla. Dec. 14, 2020) ..................................................................... 13

*United States* v. *Cooperman*, No. 22-CR-146, 2023 WL 4762710
 (N.D. Ill. July 26, 2023) ....................................................................... 13

*United States* v. *Cox*, 906 F.3d 1170 (10th Cir. 2018) ............................ 12

# TABLE OF AUTHORITIES (*continued*)

**PAGES**

*United States* v. *Diaz*, 116 F.4th 458 (5th Cir. 2024) ..............................38

*United States* v. *Fields*, 777 F.3d 799 (5th Cir. 2015) ............................40

*United States* v. *Hasson*, No. 19-CR-96, 2019 WL 4573424
  (D. Md. Sept. 20, 2019) ............................................................ 12, 13, 15

*United States* v. *Howard*, 766 F.3d 414 (5th Cir. 2014) ............. 11, 20, 38

*United States* v. *Jones*, 88 F.4th 571 (5th Cir. 2023)........................ 11, 38

*United States* v. *Medina-Cantu*, 113 F.4th 537 (5th Cir. 2024) ............37

*United States* v. *Miller*, 307 U.S. 174 (1939) ................................... 18, 22

*United States* v. *Olano*, 507 U.S. 725 (1993) .........................................39

*United States* v. *Peterson*, No. 22-CR-231, 2023 WL 5383664
  (E.D. La. Aug. 21, 2023) ..................................................................... 12, 13

*United States* v. *Pritchett*, 470 F.2d 455 (D.C. Cir. 1972) ......................27

*United States* v. *Rafoi*, 60 F.4th 982 (5th Cir. 2023) ..............................20

*United States* v. *Rahimi*, 144 S. Ct. 1889 (2024) ........................... *passim*

*United States* v. *Royce*, No. 22-cr-130, 2023 WL 2163677
  (D.N.D. Feb. 22, 2023) ...................................................................... 13, 15

*United States* v. *Saleem*, 659 F. Supp. 3d 683 (W.D.N.C. 2023) ............37

*United States* v. *Salerno*, 481 U.S. 739 (1987).......................................20

*United States* v. *Sanches*, 86 F.4th 680 (5th Cir. 2023) ..........................40

*United States* v. *Stevens*, 559 U.S. 460 (2010) .......................................38

*United States* v. *Villalobos*, No. 19-CR-40, 2023 WL 3044770
  (D. Idaho Apr. 21, 2023) ........................................................................13

# TABLE OF AUTHORITIES *(continued)*

**PAGES**

## State Cases

*Aymette* v. *State*, 2 Hum. 154 (Tenn. 1840) ............................................24

*Cockrum* v. *State*, 24 Tex. 394 (1859) ....................................................24

*State* v. *Langford*, 3 Hawks 381 (N.C. 1824) .........................................25

*State* v. *Mitchell*, 3 Blackf. 229 (Ind. 1833)...........................................25

*State* v. *Reid*, 1 Ala. 612 (1840) ..............................................................25


## Federal Statutes

18 U.S.C. § 921(a)(25).............................................................................3, 6

18 U.S.C. § 922(g)(8)...................................................................................38

18 U.S.C. § 3231 ...........................................................................................1

26 U.S.C. § 5821 ...........................................................................................4

26 U.S.C. § 5822 ...........................................................................................4

26 U.S.C. § 5841 ...........................................................................................3

26 U.S.C. § 5845(a)(7)...................................................................................3

26 U.S.C. § 5861 ...........................................................................................3

26 U.S.C. § 5861(d) ..............................................................................*passim*

26 U.S.C. § 5861(i)........................................................................................7

26 U.S.C. § 7801(a)(2)...................................................................................4

28 U.S.C. § 1291 ...........................................................................................1

# TABLE OF AUTHORITIES *(continued)*

**PAGES**

**Historical Laws**

§ 12950, ch. 564, 1939 Iowa Acts 1928 ...................................... 26, 27, 32

1935 Ala. Laws 441 ........................................................................ 26, 32

Act of Apr. 6, 1916, ch. 137, 1916 N.Y. Laws 338 ...................... 26, 27, 32

Act of Apr. 7, 1911, ch. 128, 1911 N.J. Laws 185 ............................ 26, 27

Act of Apr. 10, 1917, ch. 105, 1917 Conn. Pub. Acts 2301 ...................... 26

Act of Apr. 16, 1926, ch. 261, 1926 Mass. Acts 256 ................... 26, 27, 32

Act of Apr. 22, 1927, ch. 1052, § 8, 1927 R.I. Pub. Laws 256 ..... 26, 27, 32

Act of Dec. 25, 1837, § 1, 1837 Ga. Laws 90 .......................................... 25

Act of Feb. 6, 1841, ch. 1, § 1, 1841 Miss. Laws 51 ........................... 25, 35

Act of Feb. 18, 1921, § 97, ch. 83, 1921 Wyo. Sess. Laws 86 ........... 26, 27

Act of Feb. 20, 1918, ch. 6, 1918 Mont. Laws 13 .............................. 26, 32

Act of Jan. 9, 1934, act 26 § 7, 1934 Haw. Sess. Laws 35 ................ 26, 27

Act of Jan. 30, 1835, 1835 Fla. Laws 36 ................................................ 35

Act of July 6, 1910, ch. 142, § 6, 1910 La. Acts 218 ................................ 26

Act of June 6, 1919, § 3, 1919 Ohio Laws 577 ........................................ 26

Act of June 30, 1837, 1837 Ala. Laws 7 .................................................. 35

Act of Mar. 7, 1925, ch. 460, § 4, 1925 N.C. Sess. Laws 529 ........... 26, 27

Act of Mar. 11, 1931, ch. 370, § 19, 1931 Or. Laws 684 ......................... 26

Act of Mar. 12, 1909, ch. 122, 1909 N.D. Laws 130 .......................... 26, 32

# TABLE OF AUTHORITIES *(continued)*

**PAGES**

Act of Mar. 13, 1913, ch. 64, 1913 Minn. Laws 55.......................26, 27, 32

Act of Mar. 18, 1929, ch. 84, § 14, 1929 Ariz. Sess. Laws 235................26

Act of Mar. 24, 1909, ch. 129, 1909 Me. Laws 141 ....................26, 27, 32

Act of Mar. 27, 1933, ch. 39, 1933 Cal. Stat. 329.............................26, 32

Act of Mar. 29, 1927, ch. 169, 1927 Del. Laws 516..........................26, 27

Act of May 5, 1921, no. 173, § 5, 1921 Pa. Laws 353..............................26

Act of May 7, 1913, no. 250, 1913 Mich. Pub. Acts 472....................26, 32

Act of Nov. 14, 1912, no. 237, 1912 Vt. Acts & Resolves 310 ..........26, 27

Statute of Northampton, 2 Edw. 3 c. 3 (1328) .......................................23

Supplement V The Code of the District of Columbia
  (to March 4, 1929) 43 (1939)...........................................................26, 27

Virginia Act of Feb. 27, 1631..................................................................34

## Federal Rules

Fed. R. Crim. P. 52(b)..............................................................................38

## Other Authorities

*$80,000 Robbery Just Off 5th Av.*, N.Y. Times, Mar. 17, 1921................28

1 A New and Complete Law Dictionary (1771) ......................................11

1 Dictionary of the English Language (4th ed. 1773).............................11

1 R. Burn, *The Justice of the Peace, and Parish Officer* (2d ed. 1756)...23

## TABLE OF AUTHORITIES *(continued)*

**PAGES**

1 W. Russell, *A Treatise on Crimes and Indictable Misdemeanors* (1831) ................................................................................22

1 William Hawkins, *A Treatise of the Pleas of the Crown* (1716)...........23

3 B. Wilson, *Works of the Honourable James Wilson* (1804)..................22

3 *Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred* (1810) .......................34

4 William Blackstone, *Commentaries on the Laws of England* (10th ed. 1787) ................................................................. 23, 24

15 *The Public Records of the Colony of Connecticut* (1890)....................36

Am. Speech-Language-Hearing Ass'n, *Recreational Firearm Noise Exposure* https://www.asha.org/public/hearing/Recreational-Firearm-Noise-Exposure/ (operational as of October 31, 2024).........................16

An Act Against Wearing Swords, ch. 9, in Aaron Leaming & Jacob Spicer, *Grants, Concessions, and Original Constitutions of the Province of New Jersey* (2d ed. 1881) ....................................................23

Bureau of Alcohol, Tobacco, Firearms and Explosives, *How must licensees mark silencers that have different attachment methods? https://www.atf.gov/rules-and-regulations/qa/how-must-licensees-mark-silencers-have-different-attachment-methods* (operational as of October 31, 2024) ..................................................................................5

C. Humphreys, *A Compendium of the Common Law in Force in Kentucky* (1822) ................................................................................22

*Colonial Laws of Massachusetts Reprinted from the Edition of 1672* (1890) ........................................................................................36

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495 (2019)............................18

**TABLE OF AUTHORITIES** *(continued)*

**PAGES**

E. Lewis, *An Abridgment of the Criminal Law of the United States* (1847) ....................................................................................22

E. Ladd, *Burn's Abridgement, Or The American Justice* (2d ed. 1792)........................................................................24

F. Wharton, *A Treatise on the Criminal Law of the United States* (1852) ....................................................................................22

H. Stephen, *Summary of the Criminal Law* (1840)................................22

J. Dunlap, *The New-York Justice* (1815) ................................................22

J. Parker, *Conductor Generalis* (1764) ..................................................24

J. Parker, *Conductor Generalis* (Robert Campbell printing 1792) ........24

J. Parker, *Conductor Generalis* (Robert Hodge printing 1788)..............24

J. Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer*, (1773) ....................................................24

*Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807* (1807)..........................................34

*Laws of the State of Maine* (1830) ........................................................35

L. Kennett & J. Anderson, *The Gun in America* (1975) .........................28

Lisa Marie Pane, *Did 'Silencer' Make a Difference in Virginia Beach Carnage?*, Associated Press (June 2, 2019) https://www.wwlp.com/news/top-stories/did-gunmans-silencer-make-a-difference-in-the-carnage/ (operational as of October 31, 2024)..........30

*Maxim Bans Gun Silencer*, N.Y. Times, May 8, 1930 ...........................29

**TABLE OF AUTHORITIES** *(continued)*

**PAGES**

Michael Stewart *et al.*, Nat'l Hearing Conservation Ass'n, *NHCA Position Statement: Recreational Firearm Noise* (March 16, 2017) https://www.hearingconservation.org/assets/docs/NHCA_position_paper_on_firea.pdf (operational as of October 31, 2024) ........................... 16

*Murderer Decoys Victim By Phone*, N.Y. Times, Dec. 11, 1921 ............. 28

N. Webster, American Dictionary of the English Language (1828) ....... 11

*National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means*, 73rd Cong., 2d Sess. (1934) ................................... 29

Ordinance of the Director and Council of New Netherland Against Illegal Trade in Powder, Lead and Gunds in New Netherland by Private Persons, 1652 N.Y. Laws 128 ................................................. 33

Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemp. Probs. 231 (2020) ..................................................... 26, 28, 29

Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55 (2017) ................ 34

Robert J. Spitzer, *Understanding Gun Law History after* Bruen: *Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57 (2023) ................................................................................................. 25

*Silent Gun Kills a Family of Four*, N.Y. Times, Feb. 1, 1915 ............... 28

*Slain With Own Gun, Say Veasey's Friends*, N.Y. Times, Jan. 12, 1930 ................................................................................... 28

*Slayers Escape Police Net*, N.Y. Times, Dec. 17, 1920 ........................... 28

*The Charter and Ordinances of the City of Providence, with the General Assembly Relating to the City* (1835) ...................................... 36

## TABLE OF AUTHORITIES (continued)

**PAGES**

*The Statutes At Large; Being A Collection Of All The Laws Of Virginia, From The First Session Of The Legislature* (William Waller Henning ed., 1823) .................................................................. 34

W. Hening, *The New Virginia Justice* (1795) ......................................... 23

### Constitutional Provisions

U.S. Const. amend. II ....................................................................... *passim*

## STATEMENT OF JURISDICTION

This is an appeal from a final judgment in a criminal case. The district court had subject-matter jurisdiction under 18 U.S.C. § 3231. The district court entered the judgment of conviction on May 7, 2024. ROA.82. The defendant filed a timely notice of appeal on May 14, 2024. ROA.88. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

# ISSUES ON APPEAL

I.    Whether 26 U.S.C. § 5861(d), which prohibits the possession of an unregistered silencer, violates the Second Amendment on its face.

II.    Whether 26 U.S.C. § 5861(d) plainly violates the Second Amendment as applied to Comeaux.

## STATEMENT OF THE CASE

After police officers executed a search warrant for Brennan James Comeaux's home and found homemade, unregistered silencers, a federal grand jury indicted him under 26 U.S.C. § 5861. Comeaux unsuccessfully moved to dismiss the indictment then pleaded guilty to one count of possession of unregistered firearms—the homemade silencers—in violation of 26 U.S.C. § 5861(d). The district court sentenced him to 24 months of imprisonment, to be followed by three years of supervised release. Comeaux now appeals, challenging the constitutionality of Section 5861(d) under the Second Amendment both facially and as applied.

### *Statutory Background*

The National Firearms Act of 1934 (NFA) makes it "unlawful for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." 26 U.S.C. § 5861(d); *see also* 26 U.S.C. § 5841. A "firearm" includes "any silencer (as defined in section 921 of title 18, United States Code)." 26 U.S.C. § 5845(a)(7). In turn, 18 U.S.C. § 921(a)(25) defines "firearm silencer" and "firearm muffler" as "any device for silencing, muffling, or

diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication."

Federal law further provides that "[n]o person shall make a firearm unless" he files "with the [Attorney General] a written application," identifies the firearm to be made, identifies himself and provides his fingerprints and photograph, pays a $200 tax, and obtains "the approval of the [Attorney General] to make and register the firearm." 26 U.S.C. §§ 5821, 5822, 7801(a)(2).

### *Offense Conduct*

On May 31, 2022, the Iberia Parish Sheriff's Office dispatched deputies to Comeaux's residence in New Iberia, Louisiana, after receiving calls about an illegal discharge of a gun. ROA.150.[1] The deputies learned that Comeaux had fired a gun while yelling at his neighbors. ROA.150. When questioned, Comeaux admitted that he had discharged the gun and stated he did so only to scare his neighbors. ROA.150. Deputies obtained

---

[1] Most of the facts recounted here are from the presentence report, to which there were "no objections," and which the district court "adopt[ed]." ROA.118.

an arrest warrant for Comeaux for Illegal Discharge of a Firearm-Aggravated Assault. ROA.150.

On June 1, 2022, deputies were again dispatched to Comeaux's residence because Comeaux was again shooting guns. ROA.150. This time, deputies took written statements from the neighbors, who reported that they had observed Comeaux exit his residence, begin using loud, profane language, and then go underneath his elevated residence to fire five to six gunshots. ROA.150. When the deputies learned about Comeaux's active felony warrant, they arrested him and booked him into Iberia Parish Jail. ROA.150.

On June 2, 2022, Iberia Parish Sheriff's Office deputies executed a search warrant on Comeaux's residence, seizing multiple firearms including shotguns, rifles, and pistols. ROA.150. They also seized multiple suspected silencers, a case containing various baffles[2] and tubes consistent with parts intended for assembling silencers, and two firearm manuals detailing how to turn a semi-automatic AR-15 into a fully

---

[2] A "baffle" is "the primary internal component designed to reduce the sound of a projectile," sometimes called "baffling material" or "expansion chamber." Bureau of Alcohol, Tobacco, Firearms and Explosives, *How must licensees mark silencers that have different attachment methods?* June 21, 2023, available at https://www.atf.gov/rules-and-regulations/qa/how-must-licensees-mark-silencers-have-different-attachment-methods.

automatic weapon. ROA.108; ROA.150-151. Deputies also found a dry-erase board with the words, "If you live on the west side of me you need to die today . . . because you are to fucking noise punk, and your bitch." ROA.151. The neighbors involved in the dispute lived to the west of Comeaux's residence. ROA.151.

Based on the recovered items, the local sheriff's department contacted the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). ATF Special Agent Bradley Boos inspected the suspected silencers and parts and determined that they were consistent with a "device for silencing, muffling, or diminishing the report of a portable firearm." ROA.151 (quoting 18 U.S.C. § 921(a)(25)). Special Agent Boos later interviewed Comeaux in jail. ROA.151. Comeaux admitted that he had manufactured and possessed the silencers. He said that he needed them for protection from his neighbors because they were causing him trouble. ROA.151-152.

Deputies from the sheriff's office also interviewed Comeaux that same day. ROA.152. Comeaux told the deputies that he believed that his neighbors had vandalized his vehicles, put cooking oil in his equipment, and sprayed his yard with weed killer and salt. ROA.152. Comeaux also

told them that he almost put a bullet in his neighbor. ROA.152. He further claimed that his neighbors put a thermal camera on him, causing him to fall asleep. ROA.152. According to Comeaux, using firearms was his only means of defense against his neighbors, and he had wielded a pistol to put some fear in them. ROA.152.

A check of Iberia Parish Sheriff's Office records revealed that, since September 2019, approximately eleven calls were issued for Comeaux's residence for illegal discharge of a gun, but no actions had been taken due to Comeaux's denying the discharge and neighbors not providing written statements about the incidents. ROA.152.

### District Court Proceedings

On August 16, 2023, a federal grand jury returned a two-count indictment charging Comeaux with one count of possessing an unregistered firearm, in violation of 26 U.S.C. § 5861(d), and one count of possessing a firearm unidentified by a serial number, in violation of 26 U.S.C. § 5861(i). ROA.9-10. Both counts listed the five homemade silencers as the "firearm[s]." ROA.9-10.

Comeaux moved to dismiss the indictment, arguing that Sections 5861(d) and (i) violate the Second Amendment on their face and as

applied to him. ROA.29-39. The district court denied Comeaux's motion,
explaining that silencers are "dangerous and unusual weapons" that are
not protected by the Second Amendment. ROA.52-59.

Comeaux and the government subsequently entered into a plea
agreement, pursuant to which Comeaux pleaded guilty to one count of
possession of unregistered firearms in violation of 26 U.S.C. § 5861(d).
ROA.64. The agreement preserved Comeaux's right to press his
constitutional challenge on appeal. ROA.132. The district court
sentenced Comeaux to 24 months in prison and three years of supervised
release. ROA.83-84.

## SUMMARY OF THE ARGUMENT

Comeaux's Second Amendment claims lack merit. As a threshold
matter, silencers are not "Arms" covered by the Second Amendment.
They are neither weapons of offense nor armor of defense as historically
understood. Indeed, silencers have no offensive or defensive use unless
they are attached to a gun and are unnecessary accessories to guns.
Regulations of silencers, therefore, do not implicate the Second
Amendment.

In any event, even if silencers are "Arms," their regulation is justified by the historical tradition of regulating and prohibiting the possession of dangerous and unusual weapons. The country's legal history contains numerous examples of laws analogous to 26 U.S.C. § 5861(d). And ever since silencers were invented, they have been considered dangerous and unusual and not in common use for lawful purposes. Accordingly, even a complete ban would be constitutional, so Section 5861(d)'s registration requirements certainly are. Indeed, laws like Section 5861(d) that merely impose registration requirements comport with the historical tradition of regulating commerce in firearms.

Comeaux did not adequately preserve an as-applied challenge to Section 5861(d), so the challenge should be reviewed only for plain error. And there was no error at all. The Supreme Court recently held that it is consistent with the Second Amendment to disarm people who pose a clear threat of physical violence to others. Comeaux admitted to firing shots to scare his neighbors, and other evidence indicates that he might resort to violence against them. The Second Amendment thus does not preclude prosecution for illegal possession of firearms.

## ARGUMENT

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Ass'n, Inc.* v. *Bruen*, 597 U.S. 1, 24 (2022). On appeal, Comeaux claims that 26 U.S.C. § 5861(d) is unconstitutional both on its face and as applied. Both claims fail at the outset, because the Second Amendment does not cover silencers. And even if it did, their regulation in general and in this case is permissible.

## I.    Comeaux's Constitutional Claims Are Misplaced Because Silencers Are Not "Arms" Covered By The Second Amendment

Both of Comeaux's Second Amendment claims are misplaced for the threshold reason that his conduct—possessing unregistered silencers—is not covered by the plain text of the Second Amendment. Silencers are not "Arms" but are instead unnecessary accessories to arms.

## A.    Standard Of Review

This Court "review[s] preserved challenges to the constitutionality of a criminal statute de novo," but where a defendant fails to raise an issue in the district court, the Court reviews for plain error. *United States* v. *Howard*, 766 F.3d 414, 419 (5th Cir. 2014); *United States* v. *Jones*, 88 F.4th 571, 572 (5th Cir. 2023) (per curiam), *cert. denied*, 144 S. Ct. 1081 (2024).

## B.    Silencers Are Not "Arms"

Original meaning, Supreme Court precedent, and other court holdings make clear that silencers are not "Arms" within the meaning of the Second Amendment.

When the Second Amendment was ratified, the word "Arms" was understood to mean "[w]eapons of offence, or armour of defence." *District of Columbia* v. *Heller*, 554 U.S. 570, 581 (2008) (quoting 1 Dictionary of the English Language 106 (4th ed. 1773) (alteration in original)); *see also* 1 A New and Complete Law Dictionary (1771) (defining "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another"); N. Webster, American Dictionary of the English Language (1828) (defining "arms" as "[w]eapons of offense,

or armor for defense and protection of the body" or "any thing which a man takes in his hand in anger, to strike or assault another"). Silencers are not "Arms" under that definition.

A silencer "cannot on its own cause any harm and is not useful independent of its attachment to a firearm." *United States* v. *Peterson*, No. 22-CR-231, 2023 WL 5383664, at *1 (E.D. La. Aug. 21, 2023). A silencer "is not itself used 'to cast at or strike another,' it does not contain, feed, or project ammunition, and it does not serve any intrinsic self-defense purpose." *United States* v. *Hasson*, No. 19-CR-96, 2019 WL 4573424, at *4 (D. Md. Sept. 20, 2019), *aff'd on other grounds*, 26 F.4th 610 (4th Cir. 2022). Thus, a silencer is not, of itself, a "weapon of offence" or "armour of defence."

Numerous court decisions confirm that silencers are not "Arms." As the Tenth Circuit has explained, a "silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence')," and therefore "it can't be a 'bearable arm' protected by the Second Amendment." *United States* v. *Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018). And many district courts have similarly recognized that "Arms" do not include silencers. *See Second Amend. Found., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms &*

*Explosives*, 702 F. Supp. 3d 513, 536 (N.D. Tex. 2023); *Peterson*, 2023 WL 5383664, at \*1-\*2; *United States* v. *Cooperman*, No. 22-CR-146, 2023 WL 4762710, at \*1 (N.D. Ill. July 26, 2023); *Cox* v. *United States*, No. 11-CR-22, 2023 WL 4203261, at \*7 (D. Alaska June 27, 2023); *United States* v. *Villalobos*, No. 19-CR-40, 2023 WL 3044770, at \*12 (D. Idaho Apr. 21, 2023); *United States* v. *Royce*, No. 22-cr-130, 2023 WL 2163677, at \*4 (D.N.D. Feb. 22, 2023); *United States* v. *Al-Azhari*, No. 20-CR-206, 2020 WL 7334512, at \*3 (M.D. Fla. Dec. 14, 2020); *Hasson*, 2019 WL 4573424, at \*4.

Nothing indicates that a silencer should be understood to be a "weapon of offence" or "armour of defence." A silencer serves no offensive or defensive purpose unless it is attached to a gun, and it is not a necessary or traditional component or accessory to an arm. It is therefore best understood as an optional accessory to an arm, not as an arm itself.

## C.    Comeaux Cannot Show That Silencers Are "Arms"

Comeaux cannot meet his burden to show that the Second Amendment's "plain text covers" his possession of silencers. *Bruen*, 597 U.S. at 24. None of his attempts to do so has merit.

a.    Comeaux asserts that a "man can take a silencer 'into his hands' and can use the instrument in 'wrath to strike another.'" Comeaux's Brief at 18. But a silencer is not an "Arm[]" under the Second Amendment simply because it can be used to strike another person. Any number of cylindrical metal objects—from flashlights to travel coffee mugs to cans of soda—can be used to strike another person. But that does not make all Dr. Pepper cans constitutionally protected "Arms." Unlike weapons such as firearms, such objects are neither designed to be used as weapons, nor are they customarily so used. Nor does the mere fact that a suppressor can be attached to a firearm make the suppressor itself an arm. Other accessories such as flashlights, sights, and bipods can be attached to firearms but are not, by themselves, "Arms."

b.    Comeaux separately contends that silencers fall within the scope of the Second Amendment on the theory that they are "accoutrements" that are "necessary to the use of arms." Comeaux's Brief at 19 (citation omitted). But even if "the right to possess firearms for protection implies a corresponding right to possess component parts necessary to make the firearms operable," *Kolbe* v. *Hogan*, 813 F.3d 160, 175 (4th Cir. 2016) (internal quotation marks omitted), *vacated on reh'g*

14

*en banc on other grounds*, 849 F.3d 114 (4th Cir. 2017), that would not cover silencers.

A silencer is not necessary to the use of arms. Unlike, say, ammunition or a firing pin, silencers are "not necessary to make a firearm operable." *Royce*, 2023 WL 2163677, at *4. Instead, "a silencer is simply a means to reduce sound [e]mitted from a firearm." *Ibid.* A "firearm remains an effective weapon without a silencer of any type attached." *Hasson*, 2019 WL 4573424, at *5. Everyday practices demonstrate as much—myriad police officers, security guards, members of the military, and private citizens can and do use firearms without a silencer.

Indeed, silencers are not even necessary for the purpose proffered by Comeaux—to protect his hearing when using the firearm. Shooters ordinarily use other forms of hearing protection when shooting firearms. The American Speech-Language-Hearing Association, for example, commends *"[a]lways"* using hearing protection devices "any time you fire a gun," but only recommends "[c]onsider[ing] using a firearm suppressor *in addition to* using [hearing protection devices]." Am. Speech-Language-

Hearing Ass'n, *Recreational Firearm Noise Exposure* (emphasis added).[3]
Indeed, silencers are not in themselves effective at reducing the noise of
a gunshot to safe levels. Experts at the National Hearing Conservation
Association recommend "wearing hearing protection devices," like
earplugs or headphones, precisely because "[s]uppressors cannot reduce
the noise caused by the supersonic flight of the projectile breaking the
sound barrier once it leaves the barrel of the firearm." Michael Stewart
*et al.*, Nat'l Hearing Conservation Ass'n, *NHCA Position Statement:
Recreational Firearm Noise* 1, 4-5 (March 16, 2017).[4] Though silencers
and suppressors may be helpful, they are by no means necessary, even
for the purposes Comeaux posits here.

     c.     In a somewhat overlapping argument, Comeaux asserts that
silencers "are implicitly protected under the Second Amendment" on the
theory that they allow exercise of the right without hearing damage.
Comeaux's Brief at 25, 27. In particular, he quotes the three-Justice
opinion in *Richmond Newspapers, Inc.* v. *Virginia*, 448 U.S. 555 (1980),

---

[3] Available at http://www.asha.org/public/hearing/Recreational-Firearm-Noise-Exposure/.

[4] Available at https://www.hearingconservation.org/assets/docs/NHCA_position_paper_on_firea.pdf.

for the proposition that when an unarticulated right is "indispensable to the enjoyment of rights explicitly defined," it will "share constitutional protection in common with explicit guarantees." *Id.* at 580. But even under that rubric,[5] silencers would not be implicitly protected.

As just explained, silencers are not "indispensable to the enjoyment" of the explicitly protected right to "bear Arms." Comeaux contends that "using silencers not only provides considerable health benefits to the shooter and those within the vicinity of the shots, but they also improve accuracy and reduce disorientation after firing." Comeaux's Brief at 26-27. But those are arguments that silencers are helpful, not that they are indispensable. Something used to add "benefits" to or "improve" the experience of keeping and bearing arms is, by definition, not "indispensable to the enjoyment" of that right.

d.    Relatedly, Comeaux argues that the scope of the Second Amendment extends to the "'proper accoutrements' or related items and

---

[5] The Supreme Court has explained that "when the Second Amendment's *plain text* covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17, 24 (emphasis added). An argument that something is implicitly covered necessarily arises only when it is not covered by the plain text. And given the ordinary presumption of constitutionality, *see Immigration & Naturalization Serv.* v. *Chadha*, 462 U.S. 919, 944 (1983), conduct that is only implicitly covered—and not plainly covered by the text—cannot be presumptively protected conduct.

accessories that rendered the firearm as useable." Comeaux's Brief at 18 (quoting *United States* v. *Miller*, 307 U.S. 174, 182 (1939)). He asserts that, at the Founding, such accoutrements included ammunition, bayonets, cartridge boxes, a sufficient belt, two spare flints, a good knapsack, canteen, gun-cleaning equipment, holsters, scabbards, and items used to keep firearms from decaying. *Id.* at 18-19. But even assuming this list of accoutrements falls within the scope of the right to keep and bear arms, those accoutrements are not anything like a silencer.

Ammunition, cartridge boxes, and spare flints are all necessary for a gun to function. Bayonets, belts, knapsacks, and canteens are best categorized as items needed by militiamen going off to war. *See Miller*, 307 U.S. at 181-182 (discussing these accoutrements in connection with militia service). And gun-cleaning equipment, holsters, scabbards, and items used to keep firearms from decaying are all used to properly care for the weapon so that it continues functioning. *See* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 521-522 (2019) (labeling these as items used for "[g]un care" and "[a]rms carrying and storage").

A silencer, on the other hand, reduces the noise a gun makes. It is not necessary for the gun to function, it is not historically connected to militia service, and it does nothing to care for the gun. Silencers are therefore not of a piece with the other items that Comeaux lists as "proper accoutrements."

e. Finally, Comeaux asserts that "some attention must be given to the statutes regulating silencers that have intentionally chosen to define silencers as 'firearms.'" Comeaux's Brief at 24. Such statutes are not probative here. The Supreme Court has repeatedly instructed that statutory labels are controlling for statutory purposes but not for constitutional purposes. *See, e.g.*, *Bailey* v. *Drexel Furniture Co.*, 259 U.S. 20, 38 (1922); *Dep't of Transp.* v. *Ass'n of Am. Railroads*, 575 U.S. 43, 51 (2015) ("Congressional pronouncements, though instructive as to matters within Congress'[s] authority to address, are not dispositive" for "analysis under the Constitution.") (citation omitted). Constitutional questions are "not controlled by Congress's choice of label." *Nat'l Fed'n of Indep. Bus.* v. *Sebelius*, 567 U.S. 519, 564 (2012).

## II.   Section 5861(d)'s Requirements For The Possession Of Firearm Silencers Are Facially Constitutional Under The Second Amendment

Even if silencers were considered "Arms," Section 5861(d)'s regulation of them is "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24, and therefore constitutional.

### A.   Standard Of Review

Because Comeaux raised his facial challenge to 26 U.S.C. § 5861(d) in the district court, this Court reviews that claim de novo. *Howard*, 766 F.3d at 419; *United States* v. *Rafoi*, 60 F.4th 982, 996-998 (5th Cir. 2023). A facial challenge "is the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the Act would be valid.'" *United States* v. *Rahimi*, 144 S. Ct. 1889, 1898 (2024) (quoting *United States* v. *Salerno*, 481 U.S. 739, 745 (1987)). If Section 5861(d) "is constitutional in some of its applications," Comeaux's facial challenge fails. *Ibid.*

### B.   Historical Tradition Supports Section 5861(d)'s Regulation Of Silencers

Assuming *arguendo* that silencers are "Arms," Comeaux's constitutional challenge still lacks merit. "Like most rights," the Supreme Court has explained, "the right secured by the Second

Amendment is not unlimited." *Rahimi*, 144 S. Ct. at 1897 (quoting *Heller*, 554 U.S. at 626). "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626.

To give shape to the Second Amendment's contours, courts examine the country's "historical tradition of firearm regulation." *Rahimi*, 144 S. Ct. at 1897 (quoting *Bruen*, 597 U.S. at 17). "[I]f a challenged regulation fits within that tradition, it is lawful under the Second Amendment." *Ibid.*; *see id.* at 1898 (explaining that the "appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition").

Section 5861(d)'s regulation of silencers fits within the national tradition of firearm regulation for multiple independent reasons. First, the regulation is consistent with historical restrictions on dangerous and unusual weapons. Second, the regulation via the NFA's registration and taxation requirements is analogous to historical laws regulating commerce in firearms.

### 1.    *Regulation Of Silencers Is Part Of The Traditional Regulation Of Dangerous And Unusual Devices*

The Nation has a robust tradition of regulating devices that are deemed "dangerous and unusual." Regulation of silencers is consistent with that tradition.

a.    As the Supreme Court has recognized, an "important limitation on the right to keep and carry arms" is that "the sorts of weapons protected were those 'in common use at the time.'" *Heller*, 554 U.S. at 627 (quoting *Miller*, 307 U.S. at 179). The "traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." *Id.* at 624. And there was a corresponding "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627; *see also* 3 B. Wilson, *Works of the Honourable James Wilson* 79 (1804); J. Dunlap, *The New-York Justice* 8 (1815); C. Humphreys, *A Compendium of the Common Law in Force in Kentucky* 482 (1822); 1 W. Russell, *A Treatise on Crimes and Indictable Misdemeanors* 271-272 (1831); H. Stephen, *Summary of the Criminal Law* 48 (1840); E. Lewis, *An Abridgment of the Criminal Law of the United States* 64 (1847); F. Wharton, *A Treatise on the Criminal Law of the United States* 726 (1852).

"[C]olonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons,'" *Bruen*, 597 U.S. at 47; *see also Heller*, 554 U.S. at 627, a practice that dated back to English common law, which prohibited "riding or going armed, with dangerous or unusual weapons," 4 W. Blackstone, *Commentaries on the Laws of England* 149 (10th ed. 1787) (emphasis omitted). As early as 1686, the colony of New Jersey prohibited the concealed carry of "unusual and unlawful weapons." An Act Against Wearing Swords, ch. 9, in Aaron Leaming & Jacob Spicer, *Grants, Concessions, and Original Constitutions of the Province of New Jersey* 289-290 (2d ed. 1881). And colonial justice-of-the-peace manuals generally authorized justices to confiscate the arms of a person who "arm[ed] himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." 1 R. Burn, *The Justice of the Peace, and Parish Officer* 13 (2d ed. 1756); 1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (1716) (same). Arming oneself in that manner was an "affray," punished as early as the Statute of Northampton, 2 Edw. 3 c. 3 (1328), and by several States in the Founding Era, *see Rahimi*, 144 S. Ct. at 1901.[6]

---

[6] *See also* W. Hening, *The New Virginia Justice* 17 (1795) (Va.) ("[T]here may

Courts in the early Republic understood and applied the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" in other ways as well. *See Heller*, 554 U.S. at 627 (citing, among other sources, 4 Blackstone, *Commentaries* 148-149). For example, in *Aymette* v. *State*, the court rejected the argument that the right to keep and bear arms gave "to every man the right to arm himself in any manner he may choose, however unusual or dangerous the weapons he may employ, and, thus armed, to appear wherever he may think proper." 2 Hum. 154, 156 (Tenn. 1840); *see id.* at 159 ("The Legislature . . . have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defence.").

Similarly, in *Cockrum* v. *State*, the court distinguished between assaults with weapons that are "lawful to carry" and "more dangerous

---

be an affray[] where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people; which is said always to have been an offense at the common law, and is strictly prohibited by statute."); E. Ladd, *Burn's Abridgement, Or The American Justice* 22 (2d ed. 1792) (N.H.) (same); J. Parker, *Conductor Generalis* 11 (1764) (N.J.) (same); J. Parker, *Conductor Generalis* 11 (Robert Hodge printing 1788) (N.Y.) (same); J. Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* 12 (1773) (Mass.) (same and specifying that it is not affray if the person wears "common weapons" in "the common fashion to make use of them"); J. Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.) (repeating exception for "common weapons" used in "the common fashion").

instrument[s]," which are "much more likely to be seriously injurious to other people," holding that the legislature could impose a distinct punishment for the more dangerous act. 24 Tex. 394, 402 (1859); *see also State* v. *Mitchell*, 3 Blackf. 229, 229 (Ind. 1833); *State* v. *Reid*, 1 Ala. 612, 620 (1840); *State* v. *Langford*, 3 Hawks 381, 383 (N.C. 1824). Exercising that authority, as novel weapons arose with new inventions and technology, States often banned them if they were deemed dangerous and unusual.[7] For example, States banned weapons like "slung shots," brass knuckles, and billy clubs, again demonstrating that States saw no constitutional problem with regulating innovations that were dangerous and unusual.[8]

---

[7] *See, e.g.*, Robert J. Spitzer, *Understanding Gun Law History after* Bruen: *Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57, 88-98 (2023); *see also* Act of Dec. 25, 1837, § 1, 1837 Ga. Laws 90 (prohibiting possession of "Bowie, or any other kinds of knives"); Act of Feb. 6, 1841, ch. 1, § 1, 1841 Miss. Laws 51, 52 (imposing tax on private possession of "Bowie Knife" of $1 per knife). Note that the Bowie knife was invented around 1827. Spitzer, *Understanding Gun Law History after* Bruen, *supra*, at 88-89.

[8] *See, e.g.*, Act of Apr. 7, 1849, ch. 278, § 2, 1849 N.Y. Laws 403, 404 (banning possession of a "slung shot"); Act of Nov. 12, 1849, No. 36, § 2, 1849 Vt. Acts 26 (same); Act of Dec. 28, 1859, ch. 164, § 10-11, 1859 Mass. Acts 815, 816 (increasing punishment for "committing a criminal offence" with a "slung shot, metallic knuckles, billies, or other weapon" and prohibiting the manufacture and sale of the same); Spitzer, *Understanding Gun Law History after* Bruen, *supra*, at 105-110 (cataloging the various regulations on dangerous and unusual weapons). Note the first known use of a "slung shot" was in 1842. *Id.* at 97.

b.    The tradition of banning dangerous and unusual weapons continued through the point in time when "silencers" arrived on the scene. Invented by Hiram Maxim in 1908, the "silencer," as he called them, quickly became perceived as an instrument of crime. Multiple States responded by banning them. *See* Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemp. Probs. 231, 245-249 (2020) ("Objections to civilian use of silencers appeared almost immediately."). [9]

By 1940, over twenty states or territories and the District of Columbia either prohibited or regulated silencers. Some banned them in

---

[9] At least 24 jurisdictions regulated silencers soon after their invention: 1935 Ala. Laws 441, 485; Act of Mar. 18, 1929, ch. 84, § 14, 1929 Ariz. Sess. Laws 235, 246-247; Act of Mar. 27, 1933, ch. 39, 1933 Cal. Stat. 329, 329-330; Act of Apr. 10, 1917, ch. 105, 1917 Conn. Pub. Acts 2301; Act of Mar. 29, 1927, ch. 169, 1927 Del. Laws 516; § 12950, ch. 564, 1939 Iowa Acts 1928, 1929; Act of July 6, 1910, ch. 142, § 6, 1910 La. Acts 218, 219; Act of Apr. 16, 1926, ch. 261, 1926 Mass. Acts 256; Act of Mar. 24, 1909, ch. 129, 1909 Me. Laws 141; Act of May 7, 1913, no. 250, 1913 Mich. Pub. Acts 472; Act of Mar. 13, 1913, ch. 64, 1913 Minn. Laws 55; Act of Feb. 20, 1918, ch. 6, 1918 Mont. Laws 13; Act of Mar. 7, 1925, ch. 460, § 4, 1925 N.C. Sess. Laws 529, 530; Act of Apr. 7, 1911, ch. 128, 1911 N.J. Laws 185; Act of Apr. 6, 1916, ch. 137, 1916 N.Y. Laws 338; Act of Mar. 12, 1909, ch. 122, 1909 N.D. Laws 130; Act of June 6, 1919, § 3, 1919 Ohio Laws 577, 581-582; Act of Mar. 11, 1931, ch. 370, § 19, 1931 Or. Laws 684, 701; Act of May 5, 1921, no. 173, § 5, 1921 Pa. Laws 353, 365; Act of Apr. 22, 1927, ch. 1052, § 8, 1927 R.I. Pub. Laws 256, 259; Act of Nov. 14, 1912, no. 237, 1912 Vt. Acts & Resolves 310; Act of Feb. 18, 1921, § 97, ch. 83, 1921 Wyo. Sess. Laws 86, 112-113; Act of Jan. 9, 1934, act 26 § 7, 1934 Haw. Sess. Laws 35, 38-39; Supplement V The Code of the District of Columbia (to March 4, 1929) 43, 45 (1939).

hunting.[10]  Others  banned  them  for  any  use.[11]  Some  jurisdictions

expressly restricted silencers alongside other dangerous weapons.[12]

---

[10] *See, e.g.*, Act of Mar. 29, 1927, ch. 169, 1927 Del. Laws 516 (making it "unlawful to use any silencer or noise-reducing contrivance on any gun" while hunting); Act of Mar. 7, 1925, ch. 460, § 4, 1925 N.C. Sess. Laws 529, 530 (outlawing the use of "a 'Maxim silencer' or any other device thereon that will muffle the report of such gun" while hunting); Act of Apr. 7, 1911, ch. 128, 1911 N.J. Laws 185 ("It shall be unlawful to use any silencer, when hunting for game or fowl, on any gun, rifle or firearm, under a penalty of twenty dollars for each offense."); Act of Feb. 18, 1921, § 97, ch. 83, 1921 Wyo. Sess. Laws 86, 112-113 (similar).

[11] *See, e.g.,* Act of Apr. 16, 1926, ch. 261, 1926 Mass. Acts 256 (prohibiting the sale, possession, and use of "any instrument, attachment, weapon or appliance for causing the firing of any gun, revolver, pistol, or other firearm to be silent"); Act of Mar. 24, 1909, ch. 129, 1909 Me. Laws 141 (making it "unlawful for any person to sell, offer for sale, use or have in his possession, any gun, pistol or other firearm, fitted or contrived with any device for deadening the sound of explosion"); Act of Mar. 13, 1913, ch. 64, 1913 Minn. Laws 55 (prohibiting the sale or possession of "any silencer"); Act of Apr. 6, 1916, ch. 137, 1916 N.Y. Laws 338 (prohibiting the sale, possession, and use of "any instrument, attachment, weapon or appliance for causing the firing of any gun, revolver, pistol, or other firearm to be silent"); Act of Apr. 22, 1927, ch. 1052, § 8, 1927 R.I. Pub. Laws 256, 259 (making it "unlawful within this state to manufacture, sell, purchase or possess . . . any muffler, silencer or device for deadening or muffling the sound of a firearm when discharged"); Act of Nov. 14, 1912, no. 237, 1912 Vt. Acts & Resolves 310 ("A person who manufactures, sells, or uses, or possesses with intent to sell or use, an appliance known as or used for a gunsilencer shall be fined twenty-five dollars for each offense.").

[12] *See, e.g.*, Act of Jan. 9, 1934, act 26 § 7, 1934 Haw. Sess. Laws 35, 38-39 (outlawing the "manufacture, possession, sale, barter, trade, gift, transfer, or acquisition of any machine guns, sub-machine guns, automatic rifles, cannon, mufflers, silencers or devices for deadening or muffling tile sound of discharged firearms, or any bomb or bombshell"); § 12950, ch. 564, 1939 Iowa Acts 1928, 1929 (banning sale along with other dangerous weapons like "dirks," "metallic knuckles," and "skull cracker[s]"); Act of Apr. 22, 1927, ch. 1052, § 8-9, 1927 R.I. Pub. Laws 256, 259 (banning silencers and banning bombs, explosives, and "noxious liquid" in next section). The District of Columbia also enacted a ban on silencers along with its ban on "certain dangerous weapons." *See United States* v. *Pritchett*, 470 F.2d 455, 460 (D.C. Cir. 1972) (citing D.C. Code § 22-3214, 47 Stat. 654); Supplement V The Code of the District of Columbia (to March 4, 1929) 43, 45 (1939) ("No person shall . . . possess any machine gun, sawed-off shotgun, . . . blackjack, slung shot, sand club, sandbag, or switchblade knife, or metal knuckles, nor any instrument, attachment,

Criminals and poachers were a primary concern, Spitzer, *Gun Accessories and the Second Amendment*, *supra*, at 247-248, especially as news spread of crimes committed with silencers, *see Silent Gun Kills a Family of Four*, N.Y. Times, Feb. 1, 1915, at 1 (reporting triple murder and suicide with silencer in New York City); L. Kennett & J. Anderson, *The Gun in America* 202 (1975) (stating that Chicago police learned that "the city's lawbreakers were ordering sales catalogs from the Maxim Silencer Company," and similar criminal interest was reported in New York). News articles recounted crimes committed with silencers, such as jewelry store robberies, *Slayers Escape Police Net*, N.Y. Times, Dec. 17, 1920, at 1; *$80,000 Robbery Just Off 5th Av.*, N.Y. Times, Mar. 17, 1921, at 1, and murders, *Murderer Decoys Victim By Phone*, N.Y. Times, Dec. 11, 1921, at 8; *Slain With Own Gun, Say Veasey's Friends*, N.Y. Times, Jan. 12, 1930, at 20.

c.    The federal government's regulation of silencers, which began in the National Firearms Act of 1934, was of a piece with the historical tradition of regulating them as dangerous or unusual. By that time, the inventor of the silencer and his company had "discontinued

---

or appliance for causing the firing of any firearm to  be silent or intended to lessen or muffle the noise of the firing of any firearms[.]").

manufacturing silencers because of the popular impression that this invention was an aid to crime." Spitzer, *Gun Accessories and the Second Amendment*, *supra*, at 248 n.125 (quoting *Maxim Bans Gun Silencer*, N.Y. Times, May 8, 1930, at 27). And that impression made its way to Capitol Hill as members of Congress remarked that "[i]f a man is carrying" a "sawed-off shotgun or machine gun, or a silencer," then "he ought to be taken into custody anyway, because we know that he is carrying it for an unlawful purpose." *National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means*, 73rd Cong., 2d Sess. 111 (1934).

Congress accordingly perceived that the proliferation of silencers posed a threat to public safety and addressed it in the NFA. Federal lawmakers, like their state counterparts, had good reason to view silencers as dangerous. Alongside their affiliation with criminal activity, silencers also presented a threat to the public. "Anything that reduces the alert value of gunfire sound is an impediment to bystanders taking effective defensive action." Spitzer, *Gun Accessories and the Second Amendment*, *supra*, at 251. The ability to hear a gunshot, and to get a

sense of where the gunfire is coming from, is essential to allow bystanders and targets of shootings to protect themselves.

According to one expert, "a suppressor will distort the sound in such a way that it would not immediately be recognizable as gunfire." Lisa Marie Pane, *Did 'Silencer' Make a Difference in Virginia Beach Carnage?*, Associated Press (June 1, 2019).[13] In the wake of a shooting in which the shooter used a silencer, survivors reported that "they were caught off guard and initially puzzled by what was happening," with one describing "hearing something that sounded like a nail gun." *Ibid.* It was well within Congress's purview to believe silencers would prove dangerous and "specially adapted to unlawful uses." *Friedman* v. *City of Highland Park*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from denial of certiorari).

d.   The historical regulation of silencers amply illustrates that Section 5861(d) is in harmony "with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. Indeed, the "analogical reasoning requires only that the government identify a well-established

---

[13] Available at: https://www.wwlp.com/news/top-stories/did-gunmans-silencer-make-a-difference-in-the-carnage/.

and representative historical analogue, not a historical twin." *Bruen*, 597 U.S. at 30 (emphasis omitted). Here, the precise device whose regulation Comeaux objects to is one that has long been recognized, in many jurisdictions, to be regulable.

While the twentieth-century laws regulating silencers post-date the Founding, they are still probative for reinforcing the original understanding of the Second Amendment. *See Rahimi*, 144 S. Ct. at 1924 (Barrett, J., concurring) (explaining that "postenactment history can be an important tool" because "it can reinforce our understanding of the Constitution's original meaning") (internal quotation marks omitted). The Supreme Court has made clear that courts should "consider whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Bruen*, 597 U.S. at 27 (quoting *Heller*, 554 U.S. at 631).

Furthermore, even assuming that jurisdictions' immediate regulation of silencers as soon as they appeared were not in itself enough to establish the constitutionality of Section 5861(d) as a historical matter, the Supreme Court has recognized that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more

nuanced approach." *Bruen*, 597 U.S. at 27. Analogical reasoning and understanding "how and why the regulations burden a law-abiding citizen's right to armed self-defense" guides this "more nuanced approach." *Id.* at 27, 29; *Rahimi*, 144 S. Ct. at 1898 ("Why and how the regulation burdens the right are central to this inquiry.").

Here, as the above discussion shows, the "why" has always been the same—to keep people safe from dangerous and unusual weapons. The "how" also cuts against Comeaux. Dangerous and unusual weapons were typically banned outright. And when silencers first became prominent, several States prohibited them completely.[14] Others regulated their manufacture, possession, or sale.[15] The NFA took a narrower approach by merely requiring registration. If legislatures historically could prohibit possession of silencers, then today's Congress can at least require registration. As the Court explained in *Rahimi*, "if imprisonment

---

[14] *See, e.g.*, Act of Mar. 27, 1933, ch. 39, 1933 Cal. Stat. 329; § 12950, ch. 564, 1939 Iowa Acts 1928, 1929; Act of Apr. 16, 1926, ch. 261, 1926 Mass. Acts 256; Act of Mar. 24, 1909, ch. 129, 1909 Me. Laws 141; Act of Mar. 13, 1913, ch. 64, 1913 Minn. Laws 55; Act of Feb. 20, 1918, ch. 6, 1918 Mont. Laws 13; Act of Apr. 6, 1916, ch. 137, 1916 N.Y. Laws 338; Act of Mar. 12, 1909, ch. 122, 1909 N.D. Laws 130; Act of Apr. 22, 1927, ch. 1052, § 8, 1927 R.I. Pub. Laws 256, 259.

[15] *See, e.g.*, 1935 Ala. Laws 441, 485 (imposing taxation and record-keeping requirements); Act of May 7, 1913, no. 250, 1913 Mich. Pub. Acts 472 (requiring silencer registration and the register "shall be open to the inspection of all peace officers at all times").

was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament . . . is also permissible." 144 S. Ct. at 1902. That reasoning applies here because if an outright prohibition on silencers was permitted, then the lesser restriction of registration is allowed.

### 2. Section 5861(d) Is Also Part Of The Historical Tradition Of Regulating Commerce Surrounding Firearms

Section 5861(d)'s regulatory requirements, which stop far short of an outright ban, independently situate it within the distinct historical tradition of regulating the commerce surrounding firearms. *See Heller*, 554 U.S. at 626-627. The regulation of commerce in firearms has deep historical roots.

a.    Since colonial times, colonies and States have imposed restrictions on firearms as items that travel in commerce. For example, to address arms and ammunitions trafficking in the colonies, New York outlawed trading of guns, gun powder, and lead by private individuals in 1652. *See* Ordinance of the Director and Council of New Netherland Against Illegal Trade in Powder, Lead and Gunds in New Netherland by Private Persons, 1652 N.Y. Laws 128. Similarly, a "1631 Virginia law required the recording not only of all new arrivals to the colony, but also

'of arms and munitions.'" Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 76 (2017) (quoting Virginia Act of Feb. 27, 1631, Act LVI, *reprinted in* I *The Statutes At Large; Being A Collection Of All The Laws Of Virginia, From The First Session Of The Legislature* 174-175 (William Waller Henning ed., 1823)).

In 1795, Pennsylvania enacted a law requiring gunpowder stored in the public magazine to be proved and marked and prohibiting importation, transfer, or sale of any gunpowder that was not appropriately marked. 3 *Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred* 240-244 (1810). And in 1805, Massachusetts adopted a law for the appointment of "provers of fire arms" to "prove all musket barrels and pistol barrels" presented to them in exchange for a set fee. *Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807*, at 259 (1807). The law was meant to prevent firearms from being "introduced into use which are unsafe, and thereby the lives of the citizens be exposed." *Ibid.* The act imposed a ten dollar fine on any person who manufactured "any musket or pistol, without having the barrels

proved and stamped as aforesaid." *Id.* at 260. Maine adopted a similar law in 1821. *Laws of the State of Maine* 546 (1830).

b.    Regulation of firearms through taxation has a similar historical pedigree. An 1841 Mississippi law, for example, taxed Bowie knives. *See* Act of Feb. 6, 1841, ch. 1, § 1, 1841 Miss. Laws 51, 52. Similarly, in 1835, Florida passed a law stating that "it shall not be lawful for any person or persons . . . to vend dirks, pocket pistols, sword canes, or bowie knives, until he or they shall have first paid to the treasurer of the county in which he or they intend to vend weapons, a tax of two hundred dollars per annum." Act of Jan. 30, 1835, 1835 Fla. Laws 36. Alabama adopted a similar law around the same time. Act of June 30, 1837, 1837 Ala. Laws 7 (imposing a tax on "Bowie Knives" and "Arkansaw Tooth-picks" such that "for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, knives to be giving or disposing of the same, shall pay a tax of one hundred dollars").

States also implemented licensing requirements both before and after the Founding. A 1651 Massachusetts statute, for example, prohibited the transportation of "any Gun-powder out of this Jurisdiction, without license first obtained from some two of the

Magistrates." *Colonial Laws of Massachusetts Reprinted from the Edition of 1672*, at 126 (1890). Connecticut outlawed the export of "gun-powder made and manufactured . . . out of the [Colony] without . . . license." 15 *The Public Records of the Colony of Connecticut* 191 (1890) (1775 statute); *see also The Charter and Ordinances of the City of Providence, with the General Assembly Relating to the City* 37 (1835) (1821 law) (requiring "a license therefor" to sell gunpowder).

c.    Like these early laws, Section 5861(d) does not prohibit possession but imposes registration and taxation requirements to ensure they do not fall into the wrong hands. As Justice Kavanaugh has emphasized, the Supreme Court has not called into question State laws "requir[ing] a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling . . . among other possible requirements." *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring).

A registration scheme for silencers is a form of license requirement, and Section 5861(d) is no more onerous than those kinds of requirements. Indeed, the registration requirement is exactly the type of "objective[] and definite" licensing standard approved in *Bruen*. *See* 597 U. S. at 38

n.9. So, consistent with *Bruen*, even if silencers were protected by the Second Amendment, the registration requirement does not infringe on the right to possess them. *See United States* v. *Saleem*, 659 F. Supp. 3d 683, 699 n.9 (W.D.N.C. 2023) (noting that "the NFA's registration and taxation requirements are of the type that the Supreme Court in *Bruen* determined were permissible").

### 3.    *At A Minimum, Section 5861(d) Has Numerous Constitutional Applications That Preclude Facial Invalidation*

At all events, to succeed on his facial claim, Comeaux would have to "establish that no set of circumstances exists under which the Act would be valid." *Rahimi*, 144 S. Ct. at 1898 (citation omitted). "That means that to prevail, the Government need only demonstrate that Section [5861(d)] is constitutional in some of its applications." *Ibid.* The statute clearly is.

This Court recently held, for example, that unlawfully present noncitizens "are not members of the political community covered by the Second Amendment." *United States* v. *Medina-Cantu*, 113 F.4th 537, 542 (5th Cir. 2024) (per curiam) (internal quotation marks omitted). Likewise, it is constitutional to keep unregistered silencers out of the

hands of felons. *See United States* v. *Diaz*, 116 F.4th 458, 469-472 (5th Cir. 2024). And the Second Amendment permits Congress to disarm domestic abusers. *See Rahimi*, 144 S. Ct. at 1898-1899 (discussing 18 U.S.C. § 922(g)(8)). Application of Section 5861(d) would thus plainly be constitutional as applied to individuals in each of those categories; for that reason alone, it is not facially unconstitutional.

## III. Comeaux's As-Applied Challenge, Which Is Subject Only To Plain-Error Review, Lacks Merit

### A. Standard Of Review

As previously noted, a constitutional challenge to a statute that a defendant has failed to adequately preserve is subject to plain-error review. *Howard*, 766 F.3d at 419; *Jones*, 88 F.4th at 572; *see* Fed. R. Crim. P. 52(b). And here, Comeaux has forfeited his claim that Section 5861(d) is unconstitutional as applied to him. In the district court, Comeaux referred to an "as-applied" challenge only in passing. *See* ROA.31. And his broad arguments went solely to the facial validity of the unregistered silencer prohibition, with no reference to—much less discussion of—the case-specific circumstances that Comeaux now asserts as the basis for his as-applied claim. That was not enough to preserve the as-applied claim. *See United States* v. *Stevens*, 559 U.S. 460, 473 n.3 (2010) (holding that

one sentence is not enough to preserve First Amendment as-applied claim, and noting that arguments in briefs were "general," as opposed to "factual" ones that "can be evaluated only in the context of an as-applied challenge"); *see also Int'l Women's Day March Planning Comm.* v. *City of San Antonio*, 619 F.3d 346, 356 (5th Cir. 2010) (stressing that a party "must press and not merely intimate" an "as-applied" constitutional challenge to preserve it for appeal) (internal quotation marks omitted).

This Court has made clear that it will not treat an "as-applied" appellate claim as preserved where the litigant did not meaningfully pursue one in the district court, since the district court must have the first pass at assessing the "[p]articularized facts" and "developed factual record" that are "essential" to adjudicating any as-applied challenge. *Does 1-7* v. *Abbott*, 945 F.3d 307, 310 n.3 (5th Cir. 2019) (per curiam) (citation omitted). Accordingly, he is entitled to relief only if he can satisfy the strictures of plain-error review, by demonstrating an (1) error, (2) that is clear or obvious, and (3) that affects substantial rights. *United States* v. *Olano*, 507 U.S. 725, 732-734 (1993). Even then, the Court should deny relief unless the error also "seriously affect[s] the fairness,

integrity or public reputation of judicial proceedings." *Ibid.* (citation omitted).

## B. Comeaux Cannot Show Section 5861(d) Is Plainly Unconstitutional As Applied To Him

Application of Section 5861(d) to Comeaux's conduct is not error at all, let alone "clear or obvious" error. Indeed, no court has held 26 U.S.C. § 5861(d) unconstitutional as applied to any person, underscoring that plain-error relief on Comeaux's as-applied claim is unwarranted. *See United States* v. *Fields*, 777 F.3d 799, 802 (5th Cir. 2015) (explaining that the "clear or obvious" inquiry turns on "whether controlling circuit or Supreme Court precedent has reached the issue in question, or whether the legal question would be subject to reasonable dispute") (internal quotation marks omitted); *United States* v. *Sanches*, 86 F.4th 680, 686 (5th Cir. 2023) (holding that arguments that "require extending precedent . . . fail[] plain error review").

Comeaux argues that Section 5861(d) is unconstitutional as applied to him because he was not prohibited from owning firearms, was not a felon, and did not have any prior convictions for violent conduct. Comeaux's Brief at 42-43. None of that is relevant to the constitutional question. The Supreme Court has upheld firearm restrictions as applied

without looking to any of those things. *See Rahimi*, 144 S. Ct. at 1899. And Comeaux cannot show that the particular facts of his own case remove it from the range of Section 5861(d)'s constitutional applications.

Even if Comeaux could show that silencers are protected "Arms" and that the registration requirement is unconstitutional in some circumstances, he could not show Section 5861(d) is unconstitutional as applied to him. The Second Amendment protects the right to possess firearms for "lawful purposes," *Heller*, 554 U.S. at 625-626, and it allows disarming an individual who "poses a clear threat of physical violence to another," *Rahimi*, 144 S. Ct. at 1901. Comeaux is such an individual.

Comeaux possessed silencers for the unlawful purpose of assaulting his neighbors, and he posed a clear threat of physical violence to them. Police officers learned, and Comeaux later admitted, that he had discharged a firearm while yelling at his neighbors to scare them. ROA.150. Nor did he did so only once: eleven calls were placed over the last few years regarding Comeaux illegally discharging a firearm. ROA.152.

Additionally, when officers searched Comeaux's home, they found a dry-erase board with the words, "If you live on the west side of me," which apparently referred to the troublesome neighbors, "you need to die today . . . because you are to fucking noise punk, and your bitch." ROA.151. Comeaux admitted that he made and possessed the silencers for protection from his neighbors, asserting that shooting guns in his backyard was his only means of "self-defense." ROA.151-152. But his neighbors presented no physical threat to Comeaux—indeed, there is no evidence that they ever tormented him as he claims—and their alleged conduct involved nothing but non-violent property disputes. ROA.152. Yet Comeaux told deputies that he almost put a bullet in his neighbor because of the issues between them. ROA.152. Under these circumstances, prohibiting Comeaux from possessing silencers would not violate the Second Amendment.

## CONCLUSION

For the above reasons, this Court should affirm.

Respectfully submitted,

BRANDON B. BROWN
United States Attorney
Western District of Louisiana

AUSTIN W. PIATT
Attorney, United States
Department of Justice

BY:  *s/ Austin W. Piatt*

AUSTIN W. PIATT
Attorney, United States
Department of Justice
950 Pennsylvania Ave. NW
Room 5138
Washington, DC 20530
(202) 227-6370

## CERTIFICATE OF SERVICE AND COMPLIANCE WITH ECF FILING STANDARDS

I hereby certify that a copy of the foregoing Brief on Behalf of Appellee, The United States of America, was filed electronically with the Fifth Circuit Court of Appeals using the electronic filing system. Notice of this filing will be sent to counsel of record either by operation of the court's electronic filing system and/or via United States Mail to:

Mr. Dustin C. Talbot
Appellate Chief
Federal Public Defender's Office
Middle & Western Districts of Louisiana
102 Versailles Boulevard, Suite 816
Lafayette, LA 70501

In addition, I hereby certify that: (1) all required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document pursuant to 5th Cir. R. 25.2.1; and, (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Washington, D.C., this the <u>1st</u> day of November, 2024.


BY:  *s/ Austin W. Piatt*

AUSTIN W. PIATT
Attorney, United States
Department of Justice
950 Pennsylvania Ave. NW
Room 5138
Washington, DC 20530
(202) 227-6370

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

        (a)    This brief contains **<u>8,766</u>** words.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

        (a)    This brief has been prepared in a proportionally spaced typeface using:

            Software Name and Version – **<u>Microsoft Word Office 365</u>**;

            in Typeface Name and Font Size - **<u>Century Schoolbook 14 pt.</u>**

<u>s/ Austin W. Piatt</u>           <u>November 1, 2024</u>

AUSTIN W. PIATT           Date
Attorney, United States
Department of Justice